UNITED STATES of America Plaintiff,

v.

Norman WISE, Jeremy Urban, and Robert Steel Defendants.

No. 4:05 CR 170.

United States District Court,
S.D. Iowa,
Central Division.

March 2, 2006.

John E. Beamer, Lester A. Paff, U.S. Attorney's Office, Des Moines, IA, for Plaintiff.

William H. Habhab, Habhab Law Office, Ft. Dodge, IA, Joseph G. Bertogli, Attorney at Law, Ward A. Rouse, Berg Rouse Spaulding & Schmidt PLC, Des Moines, IA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO SUPPRESS

LONGSTAFF, Chief Judge.

THE COURT HAS BEFORE IT defendant Jeremy Urban's motion to suppress, filed September 20, 2005. Defendant Robert Steel filed a motion to suppress on September 23, 2005. Defendant Norman Wise filed a motion to suppress on September 23, 2005. The government resisted Wise's and Urban's motions to suppress on September 27, 2005. On January 9, 2006, the government filed its evidentiary submissions in resistance to all three motions to suppress. Defendant Steel filed an evidentiary submission in support of his motion on January 10, 2006, which was joined by defendant Urban. Defendant Wise filed his evidentiary submissions and a brief in support of the motion to suppress on January 10, 2006. An evidentiary hearing was held on February 2, 2006. The matter is considered fully submitted.[1]

## I. BACKGROUND

On May 5, 2005, defendants, Norman Wise ("Wise"), Jeremy Urban ("Urban"),

---

1. All three defendants also submitted motions to sever. Given the disposition of the motions to suppress, it is the Court's belief that these motions will no longer be relevant. The motions to sever are therefore denied without prejudice to defendants seeking to reopen them at a future date.

and Robert Steel ("Steel"), were driving eastbound on Interstate 80 through Cass and Dallas Counties in Iowa. Defendants were returning to Ohio in a Winnebago motor home in which they had left Ohio to travel to Colorado approximately five days earlier. Defendants had two interactions with police that day, both of which are relevant to these motions to suppress.

First, Deputy Darby McLaren ("Deputy McLaren"), of the Cass County Sheriff's Department pulled defendants over in Cass County, Iowa. Wise was driving. Deputy McLaren asked to see the temporary license plate, which was in the rear window of the Winnebago. Defendants provided the temporary plate to Deputy McLaren. After Deputy McLaren examined the temporary license plate, defendants returned the plate to the Winnebago's rear window.

While stopped in Cass County, Wise gave consent for Deputy McLaren to search the Winnebago. The search took approximately an hour and a half. Deputy McLaren did not discover any contraband items and released defendants to continue on their trip. Notably, Deputy McLaren did not issue a ticket or warning citation to defendants after the stop.

After releasing defendants, Deputy McLaren called the dispatch office for Dallas County, a county further east on the interstate. Deputy McLaren asked the dispatch officer whether the county had anyone who "work[ed] the interstate pretty hard." Audio CD of Phone Call on May 5, 2005.[2] Deputy McLaren was transferred to Dallas County Deputy Sheriff Troy Genovese ("Deputy Genovese"). Deputy McLaren told Deputy Genovese that he had stopped a Winnebago at mile marker 60 heading eastbound. He described defendants and the other passenger as "four shitbags, three males, one female." Audio CD. Deputy McLaren explained that the female occupant had flown to Colorado to meet her boyfriend (one of the males) and was making the drive back with them. He then informed Deputy Genovese that one of the males was a heroin user with a drug history, but that none of the other individuals had criminal records. He told Deputy Genovese that, "I couldn't find anything." Audio CD. He said that he had "put male and female who are supposed to be boyfriend and girlfriend in a car, they said three words to each other. They know they are being taped and they ain't saying shit." Audio CD. He explained that the officer who was in charge of the K-9 was not there and he was "not that good with interdiction." Audio CD. Deputy Genovese clarified that Deputy McLaren did not have a dog, and Deputy McLaren affirmed that the vehicle had not

---

**2.** Because the Court has the benefit of listening to the recorded conversation between Deputy McLaren and Deputy Genovese, all references to that conversation come directly from the audio CD unless otherwise noted. Deputy Genovese also gave testimony regarding his conversation with Deputy McLaren. In many respects, Deputy Genovese's account of the conversation differs from the CD. For example, Deputy Genovese testified that Deputy McLaren told him the defendants were acting nervous and "that they were acting hinkey. That's his exact word." Genovese Depo. at 67. At no point in the conversation did Deputy McLaren state that the defendants were acting nervous or "hinkey." Deputy Genovese testified that Deputy McLaren identified Wise as the boyfriend of the female passenger, but McLaren never did so. Deputy Genovese also testified that Deputy McLaren informed him that he had been given consent to search the vehicle. Again, however, at no point did Deputy McLaren make such a statement during the phone call. Although these inconsistencies may appear minor, as explained below they are one example of the problems with Deputy Genovese's testimony. Deputy Genovese's testimony regarding this phone call is one of the factors that contributes to this Court's negative assessment of Deputy Genovese's credibility.

been inspected by a dog. At that point, the following conversation occurred:

Deputy Genovese: What did they get stopped for? What did you stop them for?

Deputy McLaren: No plates

Deputy Genovese: Sweet. I'm all over it.

Audio CD. The two deputies then ended the conversation.

Deputy Genovese left the dispatch office and went to the interstate to intercept the Winnebago. Almost immediately after getting on Interstate 80, Deputy Genovese saw the Winnebago traveling in the opposite direction, turned around in the median, approached the Winnebago, and activated his lights to pull over the Winnebago. As Deputy Genovese approached the Winnebago from behind he was able to visualize the back of the vehicle.

Deputy Genovese testified in his deposition [3] and in court that if he had looked at the back of the vehicle, where a temporary plate would be located, he would have seen the plate. As it was, Deputy Genovese testified that he did not notice the temporary plate until after he had pulled the vehicle over and stopped his police car. At that time, however, before he exited his vehicle and began his interaction with defendants, Deputy Genovese admits he was able to see the temporary plate in the window. Although the window was tinted, it was not *illegally* tinted, and did not interfere with Deputy Genovese's view of the temporary plate.

As soon as he stopped his car, Deputy Genovese called a K–9 unit. He made this call before investigating whether the Winnebago was properly licensed, based solely on the suspicions relayed to him by the Deputy McLaren.

After calling the K–9 unit, Deputy Genovese exited his vehicle and approached the driver, defendant Steel. This occurred at approximately 4:00 p.m. Deputy Genovese asked for Steel's identification and registration, which Steel provided. Steel also retrieved the temporary license plate from the rear of the window. Deputy Genovese asked Steel to return with him to the patrol vehicle while he verified the information and issued a warning. During this time, Deputy Genovese determined that all of Steel's paperwork was valid. Despite this fact, for reasons not fully explained by Deputy Genovese, he issued a warning citation to Steel for "no plates." Government Ex. 3.

At the hearing, the Court tried to ascertain what Deputy Genovese's reasoning was in issuing the warning citation:

THE COURT: Okay. I guess—— is it not legal to have paper plates only? Is that why you issued the ticket? Why did you issue the warning ticket?

THE WITNESS: For the no plates on the vehicle.

THE COURT: So paper plates, what, don't count under Iowa law?

THE WITNESS: No, they count. If it was illegal, I would have given him a ticket for having no plates. But he had a paper plate.

THE COURT: If you have a paper plate, it's legal.

THE WITNESS: Correct. But it was not visible at the time. That was the main reasoning.

Deputy Genovese never fully explained, either in his deposition, or in his testimony at the hearing, how it is that legally dis-

---

**3.** Although it is not explained in the record, the Court assumes that state court charges were originally filed and depositions taken in the state court proceedings prior to the filing of federal charges.

playing a temporary plate can be the basis for a warning citation for "no plates." To the contrary, he gave varying and conflicting explanations of the legality of displaying a temporary plate in the rear window of a vehicle. For example, at one point in his deposition, Deputy Genovese testified in response to a question as to whether any Iowa statute made it illegal to have a temporary plate in the back window as opposed to the bumper, "It's not. *It's not illegal.*" Genovese Depo. at 60 (emphasis added). In the same deposition, however, he also testified:

Q: You would agree with me that it would not be improper for that temporary plate to be in the rear window of the Winnebago, would you not?

A: Improper or illegal?

Q: First improper

A: They vary.

Q: So you can't say?

A: That's one location

Q: It's not illegal to put it in the rear window, is it?

A: In the manner it was, it could have been put in the license plate bracket.

Q: The fact that it was in the window instead does not make it illegal does it?

A: I guess by Iowa statute I would say *yes.*

Genovese Depo. at 16 (emphasis added). Deputy Genovese issued the warning for "no plates" at 4:25 p.m., approximately 20–25 minutes after he stopped defendants. It is unclear whether Deputy Genovese had spoken with any of the passengers prior to that point.[4]

After issuing the warning citation, Deputy Genovese asked Steel for consent to search the vehicle. Steel verbally consented. Although he had one with him, Deputy Genovese elected not to have Steel sign a consent to search form. Furthermore, Deputy Genovese also elected not to turn on his tape recorder during the stop.

Around the time Steel consented, Deputy Johansen also of the Dallas County Sheriff's Department, arrived. The three passengers, Wise, Urban, and Beth Gallardo[5] ("Gallardo"), were removed from the Winnebago. Wise was placed in handcuffs because he had a prior weapon's charge and was clenching his fists. Steel and Gallardo were placed in the back of Deputy Genovese's vehicle and Urban and Wise were placed in the back of Deputy Johansen's vehicle. Although it is unclear whether the rear doors of Deputy Johansen's vehicle can be opened from the inside, Deputy Genovese's vehicle doors automatically lock. Once Steel and Gallardo were placed in the vehicle, they could not exit the vehicle unless it was opened from the outside.

Approximately 15 minutes after the warning citation was issued, and 35–40 minutes after the stop began, Deputy Scott Fairerlick ("Deputy Fairerlick"), a K–9 officer, arrived. The K–9 alerted to an area around the outside bottom of the vehicle indicating that drugs were present. The officers did a hand search of the vehicle and did not find any narcotics. They did find current permanent license plates and $3,780 in cash in a duffle bag, however.

When the initial hand search did not reveal anything, the officers decided to move the vehicle to another location where they could open the slide-out. They moved the Winnebago and all four occu-

---

4. In his deposition he testified that he had not made contact with any passengers at that point. In his report, he indicated that he had run the license of all passengers. When confronted with this inconsistency, Deputy Genovese responded that he acquired three of the four licenses before asking for consent to search, but did not ask for Beth Gallardo's license until after he obtained Steel's consent.

5. Ms. Gallardo is not charged as a defendant in this matter.

pants approximately one mile to a vacant lot north of the Interstate. Once there, the officers attempted to open the slide-out. When the officers were unable to open the slide-out, they asked Steel how it operated. Steel opened the slide-out.

When the slide-out was opened, Deputy Faiferlick called the Polk County K–9 handler, Deputy George, believing the Polk County dog to be smaller and better able to get under the Winnebago. The second dog arrived and alerted to the presence of narcotics. Even with the slide-out open, however, there was still nothing to the naked eye that would raise suspicion. At that point Deputy Fairerlick got underneath the vehicle to better examine it.

Once underneath the vehicle, Deputy Faiferlick observed screws coming out of the bottom of the vehicle. When he looked from the inside, however, he could not find a way to access the screws. Finding this unusual, Deputy Faiferlick ultimately used either a tire iron or a screwdriver he found in the Winnebago to pry back a portion of the undercarriage. Deputy Fairferlick discovered plastic wrap in the undercarriage of the vehicle and directed the other officers to place the remaining defendants in handcuffs. Once defendants were in handcuffs, he crawled back under the vehicle, took his knife, slit the package and discovered what was subsequently identified as marijuana.

After this discovery, the vehicle was moved again for a more through search. Ultimately, a substantial amount of cocaine was discovered.

## II. LAW AND ANALYSIS

### A. The Legality of the Initial Traffic Stop

 Traffic stops constitute seizures under the Fourth Amendment and must be conducted within the parameters of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Accordingly, when an officer stops a vehicle, he or she must have "reasonable, articulable suspicion that criminal activity has occurred or is occurring." *United States v. Blaylock,* 421 F.3d 758, 767 (8th Cir.2005) (internal quotations omitted). In general, "a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Gregory,* 302 F.3d 805, 809 (8th Cir.2002) (*quoting United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993)).

Deputy Genovese's motivation for stopping the defendants' vehicle was drug interdiction. Typically, an officer's subjective motivations are not relevant as long as an objectively reasonable basis exists to stop the vehicle. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Williams,* 431 F.3d 296, 298 (8th Cir.2005) ("A traffic stop is constitutional, regardless of the officer's subjective intent, if the officer had probable cause to believe a traffic violation occurred."); *United States v. Williams,* 429 F.3d 767, 771 (8th Cir. 2005) ("The subjective belief of the officer that there might be illegal drugs in the vehicle does not invalidate the stop."). The government asserts that Deputy Genovese had probable cause to stop the Winnebago for failure to display license plates.

First, this Court has serious doubts about the credibility of Deputy Genovese's testimony. Deputy Genovese gave inconsistent testimony regarding several topics, including: (1) whether he spoke with occupants other than Steel before obtaining Steel's consent to search; (2) whether he believed (and continues to believe) that displaying a temporary license plate in the back window of the Winnebago was legal; (3) his conversation with Deputy McLaren; and (4) his reasoning for issuing the warning citation. In particular, this Court is troubled by Deputy Genovese's changing

testimony with respect to the legality of the temporary license plate, and his reasoning for issuing the warning citation. His deposition and hearing testimony on these issues appeared targeted at justifying the stop rather than relaying the facts.

Even if this Court accepts Deputy Genovese's testimony that he did not see the temporary license plate until after he stopped the Winnebago, it was not objectively reasonable for Deputy Genovese to believe that the Winnebago was traveling without license plates. After Deputy Genovese asked why Deputy McLaren had pulled defendants over, Deputy McLaren responded, "no plates." Given his conversation with Deputy McLaren, Deputy Genovese should have known that the vehicle was registered. Logic dictates that if Deputy McLaren released defendants, the vehicle must have been licensed. Otherwise, Deputy McLaren could have impounded the vehicle and conducted a more through search with the aid of police dogs. For Deputy Genovese not to have looked in the rear window for temporary plates before pulling the vehicle over demonstrates willful avoidance of any evidence that may have interfered with the justification for the stop.

While it is true that a traffic violation, however minor, provides probable cause to stop a vehicle, in this case there was no traffic violation. Police officers must ensure that a traffic violation actually exists before pulling over drivers and conducting an investigation. Deputy Genovese's motivation in pulling over the vehicle was not to ensure that it was properly licensed, but to search for drugs.

Given this Court's doubts about the credibility of Deputy Genovese's testimony and Deputy Genovese's prior knowledge about the Cass County stop, the Court finds that there was not an objectively reasonable basis to stop the Winnebago. Even accepting Deputy Genovese's state-

ment that he did not see the temporary license plate displayed in the window of the Winnebago until after he had activated his lights and pulled the vehicle over, Deputy Genovese willfully ignored making observations that would have avoided the stop. Deputy Genovese's stated belief that the vehicle was driving without license plates was not objectively reasonable. Accordingly, the initial stop of the Winnebago was illegal.

### B. The Continued Detention of the Defendants

■ Once Deputy Genovese pulled the Winnebago over and pulled up behind it, it is undisputed that he was able to see the temporary plate. Thus, even assuming that the initial stop was legal, at that point, any reasonable suspicion that the vehicle was traveling without plates dissipated. *See Untied States v. Edgerton*, 438 F.3d 1043 (10th Cir.2006).

The only possibly objective reason Deputy Genovese had to pull the Winnebago over was a lack of license plates. As he explained in his deposition, defendants were not speeding, driving erratically, using the lanes improperly, or committing any other traffic violations. Thus, unless he developed additional reasonable suspicion, Deputy Genovese was limited, upon stopping them, to conducting an investigation into his belief that the vehicle did not have valid license plates. *United States v. Blaylock*, 421 F.3d 758, 768 (8th Cir.2005) ("In performing a traffic stop, an officer may conduct investigatory procedures reasonably related in scope to the circumstances that initially justified the interference."). Here, Deputy Genovese's belief that the Winnebago was not displaying any license plates was absolved as soon as he placed his vehicle in park and saw the temporary plates in the window. At that

point, it became obvious that the vehicle did in fact have license plates.

It is true that when conducting a routine traffic stop, an officer may check the driver's identification and vehicle registration, ask the driver to step out of the vehicle and to the patrol car, and inquire into the driver's destination and purpose for the trip. *United States v. Gregory*, 302 F.3d 805, 809 (8th Cir.2002). The Eighth Circuit has also held that:

> [H]aving made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks *related to the traffic violation*, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered.

*United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir.1999) (internal citations omitted) (emphasis added). The case law permitting an officer to engage in such investigatory conduct, however, presumes that the officer has an objectively reasonable belief that a traffic violation has occurred and that the investigatory conduct relates to a traffic violation. All questioning by an officer must relate to the purpose of the stop, in this case, the failure to display plates. *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993).

The underlying problem with Deputy Genovese's investigation in this case is that when he exited his vehicle and began his investigation, he did not have an objectively reasonable basis to believe a traffic violation had occurred. Furthermore, in this case, Deputy Genovese knew at the time

he stopped defendants that they had been stopped and *released* in Cass County for failure to display plates. Deputy Genovese testified that in his normal practice he has stopped vehicles displaying only temporary tags simply for the purpose of checking for insurance, driver's license, and registration. Thus, he explained, when he saw the temporary plate in this case and knew that his original basis for stopping the vehicle was incorrect, he pursued his investigation anyway. While it may be Deputy Genovese's normal course of action to investigate vehicles with temporary plates simply to see if they are traveling legally, that does not make his detention of those vehicles legal. Deputy Genovese's decision to pursue the traffic stop despite seeing the temporary plates in the window coupled with his knowledge of the Cass County stop and subsequent release aggravates the illegality of the detention.

Deputy Genovese illegally detained defendants when he asked Steel for identification (and possibly some of the passengers as well), brought Steel back to his police car, and issued a warning citation, because his investigation was no longer related to the purpose of the stop. *United States v. Ruiz*, 412 F.3d 871, 879 (8th Cir.2005) ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop") (*quoting Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229, (1983)); *Barahona*, 990 F.2d at 416.

Furthermore, Deputy Genovese did not testify to any conduct on the part of defendants that provided reasonable suspicion after he stopped the vehicle. If, during the initial portion of a traffic stop, circumstances give rise to suspicions unrelated to the underlying stop, an officer may broaden his inquiry and satisfy those suspicions. *Barahona*, 990 F.2d at 416. Here, howev-

er, Deputy Genovese did not have any interaction with the passengers in the car until *after* he had issued the warning citation and obtained Steel's consent (other than perhaps obtaining their licenses). Nor did Deputy Genovese provide any reasons that Steel's behavior peaked his suspicion. Thus, there were no additional circumstances that arose during the normal course of the stop which would justify detaining defendants.

Therefore, from the time Deputy Genovese stopped his patrol vehicle behind defendants' Winnebago and saw the displayed temporary plate, to the time he sought Steel's consent to search the Winnebago—approximately 20–25 minutes—defendants were illegally detained.

These circumstances are nearly identical to a case recently decided by the Tenth Circuit. *Untied States v. Edgerton,* 438 F.3d 1043 (10th Cir.2006). There, a state trooper pulled over a vehicle at night because he was unable to read the expiration date on a temporary plate. *Id.* at 1044. After pulling over the vehicle, the trooper got out of the car, shined a flashlight on the temporary plate and saw that it was a valid temporary plate. *Id.* After identifying the valid temporary plate, the trooper asked for license and registration, issued a warning ticket, and then asked for consent to search. *Id.* at 1044. Finding that any reasonable suspicion "dissipated once he was able to read the tag," the Tenth Circuit suppressed the evidence. *Id.* The Court reasoned that the trooper was required to end the stop without undue delay as soon as the "purpose of the stop·[was] satisfied and any underlying reasonable suspicion dispelled." *Id.* at 1047. Thus, while the initial stop was valid, barring any circumstances that created independent reasonable suspicion, the trooper should have "explained to defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." *Id.* at 1051.

In the present case, as in *Edgerton,* upon finding that defendants were in fact displaying a temporary license plate, Deputy Genovese should have explained the reason for the stop and allowed defendants to continue on their way. The Government has provided no evidence, other than the conversation with Deputy McLaren and Deputy Genovese's mistaken belief that the vehicle was not displaying any plates, to justify the stop. Consequently, in order to ensure that the stop did not last any "longer than [ ] necessary to effectuate the purpose of the stop," Deputy Genovese should have allowed defendants to continue on their way. *See Royer,* 460 U.S. at 500, 103 S.Ct. 1319; *Ruiz,* 412 F.3d at 879. Even if a short detention to examine the temporary plate and Steel's license was permissible, the 20–25 minute detention was unduly long and lasted longer than necessary to establish that the vehicle was properly licensed. *Ruiz,* 412 F.3d at 879.

### C. Consent to Search

The Government argues that even if the stop and detention were illegal, the fact that Steel consented to the search of the Winnebago purged any illegality. The Government has the burden of proving that Deputy Genovese obtained voluntary consent sufficient to purge the taint of the illegal stop and detention. *United States v. Moreno,* 280 F.3d 898, 900 (8th Cir. 2002). Consent will purge the taint of an illegal stop or detention only if it is "sufficiently an act of free will to purge the primary taint." *United States v. Ramos,* 42 F.3d 1160, 1164 (8th Cir.1994) *(quoting Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

■ In determining whether a search retains the taint of an illegal seizure, this

Court must examine three factors: (1) the temporal proximity of the illegality and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *United States v. Yousif,* 308 F.3d 820, 830 (8th Cir.2002); *Moreno,* 280 F.3d at 900 (*citing Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)) (adopting standards for purging the taint from a confession to a consent to search).

■ With respect to the first factor, there was no break in time between the illegality and Steel's initial consent to search the vehicle. Deputy Genovese asked permission to search immediately after issuing a warning citation for a violation that did not occur, while Steel was still seated in the patrol vehicle. While Deputy Genovese testified that he told Steel he was free to leave prior to asking for consent to search, the request for permission followed immediately after Steel had been illegally detained for approximately 20–25 minutes.

On the other hand, after the officers moved the vehicle to a new location off the highway, Steel provided the officers with additional assistance in opening the slide-out. At this time, Steel did not object to the search, and in fact, assisted the officers in reaching the area where the dogs had alerted.[6] Accordingly, while his initial consent was not separated in time from the illegal detention, this factor weighs in favor of voluntariness because of Steel's subsequent assistance with the search. *See Moreno,* 280 F.3d at 901 (reasoning that a considerable passage of time between the illegal stop and second consent weighed in favor of a finding of voluntariness).

Next, the Court looks to the presence of intervening circumstances. Here, there were no intervening circumstances between the illegal detention and Steel's consent to search. Deputy Genovese did not inform Steel that he was free to refuse consent, *see Moreno,* 280 F.3d at 901, and requested permission to search immediately after informing Steel that he was free to go. Accordingly, no circumstances intervened to break the connection between the illegal detention and the consent. *See Yousif,* 308 F.3d at 831; *Ramos,* 42 F.3d at 1164; *see also United States v. Miller,* 146 F.3d 274, 280 (5th Cir.1998) ("The officers themselves testified that the purpose of their traffic stops was to seek the consent of drivers to search for drugs, thereby suggesting that no intervening factors would have been necessary to induce them to seek consent."). This factor weighs against a finding of voluntariness.

Finally, the Court looks to the purpose and flagrancy of the official misconduct. This factor deserves particular attention. *United States v. Kreisel,* 210 F.3d 868, 869–70 (8th Cir.2000) ("[W]e have given special attention to the Supreme Court's admonition that in deciding whether evidence should be admitted ... we should consider 'particularly, the purpose and flagrancy of the official misconduct.'" (*quoting Brown* 422 U.S. at 604, 95 S.Ct. 2254)). This case presents the unique circumstance of knowing the officer's subjective

---

6. The Court notes that there may be some question as the voluntariness of Steel's conduct at this point. By the time Steel helped officers open the slide-out, he had been stopped once in Cass County while the vehicle was searched for an hour and a half, then again for a second time in Dallas County. This second search had been going on for at least an hour, although the officers' testimony varies on this point. The officers had also moved the vehicle to a more secluded place off the highway. All four passengers in the vehicle had also been placed in the back of patrol cars, with one in handcuffs. Steel was placed in Deputy Genovese's car, which did not allow the rear doors to be opened from the inside. Although Steel was not under arrest at this time, the circumstances are such that the voluntariness of any consent at this point may be questionable.

motivation for the stop. Deputy Genovese testified repeatedly that he stopped the Winnebago because of his conversation with Deputy McLaren, and concomitantly, his suspicion that the vehicle contained narcotics. Even accepting Deputy Genovese's testimony that, at first, he did not see the temporary license plate in the window, the Court finds that Deputy Genovese's subjective motivation for stopping the Winnebago was to search, with the help of drug dogs, for narcotics.

Deputy Genovese's conduct from the time he spoke with Deputy McLaren and responded "sweet, I'm all over it," indicates that he left the station and pursued the Winnebago with the intent of searching it for drugs. As soon as he pulled the vehicle over, Deputy Genovese called a K–9 unit to the scene to assist him. Despite noticing before he exited his vehicle that defendants were displaying a temporary license plate, Deputy Genovese continued with his stop, bringing Steel back to the police car, apparently collecting the driver's licenses of at least some passengers, running checks on their licenses and registration and talking to Steel for approximately 20–25 minutes. Deputy Genovese even went so far as to issue a warning citation to Steel for a violation that was not committed. During this time, Deputy Genovese conducted an investigation of a traffic violation he knew did not exist, all the while awaiting a K–9 unit. Deputy Genovese's issuance of a warning citation for a traffic violation that did not exist is especially indicative of his desire to prolong the stop.

Deputy Genovese was motivated from the start by the desire to search the vehicle with the aid of drug dogs. Normally, an officer's subjective motivations are irrelevant (presuming they are not racially motivated) so long as there is some objective basis for the officer's actions. *See Williams*, 431 F.3d at 298. But here the lack of an objectively reasonable basis for Deputy Genovese's actions tips the third factor toward suppression. *Compare Miller*, 146 F.3d at 280 (finding that stopping a suspect without probable cause was exactly the type of police behavior the third prong of the test was meant to discourage), *and Yousif*, 308 F.3d at 831 (finding that the third factor weighed against a finding of voluntariness where, even without evidence of bad faith, officer's conduct was entirely in violation of the law), *with Moreno*, 280 F.3d at 901 (where although the stop was found to be illegal, there was no evidence that officers made the stop with the intent to "trick defendant [ ] into consenting to a search of his vehicle."), *and Kreisel*, 210 F.3d at 870 (finding that even if stop was illegal there was no evidence that police stopped the truck "as part of a preconceived plan to extract a consent to search it from the driver.").

Given that only the first factor weighs in favor of a finding of voluntariness, and that even the first factor does not weigh in the government's favor when the initial consent was given, this Court finds that Steel's consent was not voluntary. Accordingly, the consent to search provided by Steel did not purge the taint of the illegal stop or detention.

#### D. Standing

■ Having found that Steel's consent to search was not "sufficiently an act of free will to purge the primary taint," the Court must also consider the government's argument that Urban and Wise do not have standing to challenge the search.[7]

---

**7.** The government does not challenge Urban and Wise's standing to contest their detention. Even if an individual does not have standing to challenge a search of a vehicle, he or she may "contest the lawfulness of his own detention and seek to suppress evidence as the fruit of his illegal detention." *United States v. Green*, 275 F.3d 694, 699 (8th Cir.2001). As

Urban and Wise may only challenge the search if they can demonstrate a legitimate expectation of privacy as passengers in the Winnebago. *Green*, 275 F.3d at 699. "To establish a legitimate expectation of privacy, the defendants must demonstrate: (1) a subjective expectation of privacy; and (2) that this expectation is one that society is prepared to recognize as objectively reasonable." *Id.*

■ The Supreme Court has held that, in general, a passenger does not have a reasonable expectation of privacy in an automobile belonging to another. *Id.* (*citing Rakas v. Illinois*, 439 U.S. at 148–149, 99 S.Ct. 421 (1978)). This case, however, is unique. First, none of the defendants owned the automobile. Steel happened to be driving at the time they were stopped in Dallas County, but the record demonstrates that Wise was the driver for the Cass County stop. Second, the vehicle in question is not a typical car or truck, but a Winnebago equipped with a living space. Defendants were traveling cross country and temporarily *living* in the Winnebago at the time they were stopped. Accordingly, their presence in the vehicle was not that of typical passengers in an automobile, but more like temporary residents in a home or hotel. *See United States v. Oates*, 173 F.3d 651, 656 (8th Cir.1999) (holding that "a person's status as an overnight guest is alone enough to show that [the guest] . . . had an expectation of privacy in the home that society is prepared to recognize as reasonable." (omissions in original) (*quoting Minnesota v. Olson*, 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990))). Finally, Wise and Urban had personal possessions in the Winnebago including clothes, toiletries, and other personal property indicating that Steel did not possess a greater interest in the Winnebago than either Wise or Urban.

Given its unique circumstances, the Court finds that this case is distinguishable from the typical passenger in an automobile case. Wise and Urban had a subjective expectation of privacy in the Winnebago. Furthermore, because the Winnebago was serving as defendants residence during the trip, their expectation of privacy was objectively reasonable. Accordingly, the Court finds that Wise and Urban had a legitimate expectation of privacy and may challenge the search of the Winnebago.

## III. CONCLUSION

There was not an objectively reasonable basis to stop defendants' vehicle, and therefore the initial stop of defendants was illegal. Furthermore, even if the initial stop was legal, defendants were illegally detained. Defendant Steel's consent did not purge the taint of the illegal stop and detainment. Finally, because of the nature of the vehicle they were traveling in, defendants Wise and Urban have standing to challenge the search. Accordingly, the motions to suppress by Urban, Wise, and Steel are GRANTED.

■

passengers, Urban and Wise have standing to challenge their detention because "all occupants of a stopped vehicle are subject to a Fourth Amendment seizure." *Id.*