# IN THE COURT OF APPEALS OF IOWA

No. 15-0752
Filed April 27, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JAYEL ANTRONE COLEMAN,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Christine Dalton Ploof, District Associate Judge.

A defendant challenges the continuation of a traffic stop leading to his driving-while-barred conviction. **AFFIRMED.**

Micki Mayes of Micki M. Mayes Law Firm, Davenport, for appellant.

Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and Bower and McDonald, JJ.

**TABOR, Presiding Judge.**

Jayel Coleman appeals his conviction for driving while barred. He contends the district court wrongly denied his motion to suppress evidence of his license status obtained by a police officer after reasonable suspicion for the traffic stop had evaporated. Because Iowa case law allows an officer to ask for the driver's operating license even after resolving any ambiguity as to whether criminal activity was afoot, we affirm the suppression ruling and Coleman's conviction.

## I.     Facts and Prior Proceedings

Patrolling Highway 61 at 9:30 p.m. on August 18, 2014, Eldridge police officer Jim Morris stopped a Pontiac Bonneville after his computer check revealed the car's female owner had a suspended driver's license. Only upon approaching the driver's side window did Officer Morris realize the driver was not a woman. Despite knowing he no longer had reasonable suspicion to investigate the driving status of the car's female owner, Officer Morris asked the male driver for "his license, registration, and proof of insurance." Jayel Coleman "was not able" to give the officer the registration but produced identification and told the officer he had borrowed his sister's car. The officer checked Coleman's driving status, learned that his license was barred, and arrested him.

The State filed a trial information charging Coleman with driving while barred as an habitual offender in violation of Iowa Code section 321.561 (2013). Coleman filed a motion to suppress evidence seized as a result of a traffic stop. On December 30, 2014, the district court held a suppression hearing and denied Coleman's motion with the following ruling:

> The officer had probable cause to stop the car. Although the probable cause was resolved when the officer approached the car and realized the driver was a male, he was justified in determining the identity and driving privileges of the actual driver and to ensure Defendant had authority to be driving the owner's car.

Coleman agreed to a bench trial on the minutes of evidence, and the district court found the State established the elements of driving while barred beyond a reasonable doubt. The court sentenced Coleman to unsupervised probation. Coleman filed an appeal to challenge the suppression ruling.

After the Iowa Supreme Court transferred the appeal to our court, we requested further briefing to address the impact of three recent cases—*Rodriguez v. United States*, 135 S. Ct. 1609 (2015); *In re Pardee*, 872 N.W.2d 384 (Iowa 2015); and *People v. Cummings* (*Cummings II*), 46 N.E.3d 248 (Ill. 2016) (following order from United States Supreme Court granting certiorari, vacating previous decision, and remanding for Illinois Supreme Court to consider *Rodriguez*)—on the issue raised by Coleman. The parties filed supplemental briefs on April 6, 2016.

## II. Scope of Review

We review the suppression ruling de novo because Coleman raises a constitutional argument.[1]  *See State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011).

---

[1] Coleman's appellate brief mentions both the federal and state constitutions but does not contend these facts call for an analysis under article I, section 8 of the Iowa Constitution distinct from our examination under the Fourth Amendment. At trial, Coleman did not assert a state constitutional basis for suppressing the evidence obtained during the stop. Further, on appeal Coleman largely relies on *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010), which limits its discussion to the Fourth Amendment. Accordingly, we will not look for an independent basis for suppression under our state constitution. *See State v. Prusha*, 847 N.W.2d 627, 630 (Iowa 2016); *see also State v. Lowe*, 812 N.W.2d 554, 556 (Iowa 2012).

### III. Analysis

Both the Fourth Amendment and article I, section 8 prohibit law enforcement from conducting unreasonable searches and seizures. *See State v. Tyler*, 830 N.W.2d 288, 291 (Iowa 2013). A traffic stop constitutes a seizure and, to be considered reasonable, must be supported by either probable cause or reasonable suspicion. *Id.* at 292. The seizure incident to a traffic stop is more like a *Terry* stop than a formal arrest. *See Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984), in turn citing *Terry v. Ohio*, 392 U.S. 1 (1968)). An officer has reasonable suspicion to initiate a traffic stop to investigate whether the driver has a valid operator's license "when the officer knows the registered owner of the vehicle has a suspended license, and the officer is unaware of any evidence or circumstances indicating the registered owner is not the driver of the vehicle." *Vance*, 790 N.W.2d at 781.

On appeal, Coleman does not argue Officer Morris's stop of the Pontiac Bonneville was invalid at its inception. Indeed he cannot, given the holding in *Vance*. "To be reasonable is not to be perfect . . . ." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (explaining the Fourth Amendment allows for some mistakes by police). Instead, Coleman argues: "At the point that the officer discovered the gender of the driver was not the same gender as the registered owner, the officer should have ceased any further investigation."

In response, the State contends Officer Morris had authority under *State v. Jackson*, 315 N.W.2d 766, 767 (Iowa 1982), to ask Coleman for his driver's

license.[2]  In *Jackson*, the officer stopped a car for failure to display a license plate.  315 N.W.2d at 767.  When the officer approached the car, the driver directed his attention to a properly displayed department of transportation (DOT) paper plate.  *Id.*  Our supreme court held at that point in their encounter, "there arose no requirement that [the officer] treat the defendant as if he had never seen him."  *Id.*  (noting traffic stop was not "random or selective" and did not violate the parameters of constitutional stops outlined in *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

> The *Jackson* court reasoned:
>
> Section 321.174, The Code, requires all persons operating a motor vehicle upon a highway in the state to have immediate possession of a valid operator's license, and to display the same upon the demand of a peace officer.  Notwithstanding the fact that a mistake concerning the license plates led to the defendant's stop, there was nothing illegal about the fact that, once he was stopped and exonerated, he was asked to display his operator's license.

*Id.*

Our court has applied the *Jackson* rationale to justify a peace officer asking for license and registration where the investigatory stop was based on a reasonable mistake of fact.  *See State v. Saffold*, No. 14-0223, 2015 WL 1849398, at *2-3 (Iowa Ct. App. Apr. 22, 2015) ("Because the deputy did not learn the driver was someone other than the owner until he had reached the window and was questioning the driver, the reasonable suspicion he acquired on checking the registration of the owner allowed him to complete the inquiry."); *see also State v. Knight*, 853 N.W.2d 273, 278 (Iowa Ct. App. 2014) (rejecting defendant's position that deputy "acted unreasonably in going to the driver's

---

[2] Coleman does not discuss *Jackson* in his briefing.

window to explain his mistake and ask for Knight's license").[3] We are constrained to abide by the same line of reasoning here. *See State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overrule Iowa Supreme Court precedent.").

Although we are not at liberty to overrule *Jackson*, we do recognize some questions about its continuing vitality. In *Vance,* our supreme court noted the defendant did not raise the issue of the whether the stop continued to be valid upon the officer's discovery that the driver was, in fact, not the registered owner of the car. *Vance*, 790 N.W.2d at 783 n.1. The court cited *Florida v. Royer*, 460 U.S. 491, 500 (1983), for the proposition that "the scope of an investigatory stop must be carefully tailored to its underlying justification and last no longer than necessary to effectuate the purpose of the stop." *Id*. Without acknowledging *Jackson*, the *Vance* court appeared to view the officer's authority to ask for the operating license after realizing the driver was not the owner as an open question in Iowa. The court wrote: "A number of jurisdictions have invalidated the further detention or investigation of a suspect after the initial purpose of an investigatory stop has been resolved." *Id.* (collecting cases). Ultimately, *Vance* expressed "no opinion on the merits of this issue" because it was not preserved for appellate review. 790 N.W.2d at 783 n.1.

---

[3] As an aside, in both *Knight* and *Saffold*, the officers developed independent reasonable suspicion after approaching the drivers. *Saffold*, 2015 WL 1849398, at *3 (explaining "Saffold showed signs of intoxication" when officer asked for his license); *Knight*, 853 N.W.2d at 278 ("Even assuming the deputy could do no more than tell the driver why he had made the stop and then allow him to be on his way, once the deputy smelled alcohol and saw Knight's eyes were bloodshot and watery during that conversation, the deputy developed reasonable suspicion to launch an investigation into possible drunk driving.").

The majority of jurisdictions that have examined this issue have decided once probable cause or reasonable suspicion for a traffic stop is dispelled, an officer may not continue the detention for any investigation, including asking a motorist for a driver's license. *See, e.g.*, *United States v. Trestyn*, 646 F.3d 732, 744 (10th Cir. 2011) (holding request for driver's license exceeded scope of stop's underlying justification); *United States v. Edgerton*, 438 F.3d 1043, 1044 (10th Cir. 2006) (reiterating *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994), instructs that trooper, "as a matter of courtesy," should have explained to defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration); *United States v. Valadez*, 267 F.3d 395, 398–99 (5th Cir. 2001) (holding where an officer properly initiated a stop to investigate a motor-vehicle law violation and learned no violation had occurred, the purpose of the investigatory stop was satisfied and any further detention or investigation violated the Fourth Amendment); *United States v. Wise*, 418 F. Supp. 2d 1100, 1107 (S.D. Iowa 2006) (holding deputy illegally detained defendants when he asked driver for identification because his investigation was no longer related to the purpose of the stop); *People v. Redinger*, 906 P.2d 81, 86 (Colo. 1995) (holding once purpose of initial investigation was satisfied, police conduct in requiring defendant to produce information without either reasonable suspicion or probable cause was unwarranted); *State v. Diaz*, 850 So. 2d 435, 436 (Fla. 2003) (finding no justification for continuing restraint of motorist and obtaining information from him after no question remained concerning the car's temporary license plate); *Holly v. State*, 918 N.E.2d 323 (Ind. 2009) (finding initial detention lawful because

officer knew registered owner had suspended license and person driving could not be seen before stop, but once officer determined driver was male, while registered owner was female, officer had no reason to conduct additional inquiry); *State v. Diaz-Ruiz*, 211 P.3d 836, 844 (Kan. Ct. App. 2009) (ruling "because the trooper's reasonable suspicion evaporated once he observed that the ladder was secure, the trooper had no reason to detain the defendants to perform the tasks incident to an ordinary traffic stop"); *State v. Chatton*, 463 N.E.2d 1237, 1238–41 (Ohio 1984) (holding officer who stopped vehicle with no visible license plates had no authority to further detain driver or ask for his driver's license after officer determined car had valid temporary permit); *McGaughey v. State*, 37 P.3d 130, 140 (Okla. Crim. App. 2001) (holding "an officer who realizes that his stop of a vehicle was mistaken—and who has no other cause for reasonable suspicion of the driver—has no authority to further detain the driver or his vehicle"); *State v. Farley*, 775 P.2d 835, 836 (Or. 1989) (holding police had no authority to routinely ask for driver's license and detain drivers while checking on their status after satisfying initial reason for stop); *State v. Hayen*, 751 N.W.2d 306, 311 (S.D. 2008) (holding officer's request for driver's license and proof of insurance constituted an unconstitutional detention); *State v. Morris*, 259 P.3d 116, 124 (Utah 2011) (holding that after resolving reason for stop, officer may approach driver only to explain mistake and may not constitutionally ask for identification, registration, or proof of insurance, unless officer develops independent probable cause to extend detention); *State v. DeArman*, 774 P.2d 1247, 1247–49 (Wash Ct. App. 1989) (holding officer who initially believed vehicle might be disabled because it remained motionless at

stop sign for one minute had no authority to detain, question, or seek identification from driver once it became clear that vehicle not disabled).

But other jurisdictions have allowed officers to request a driver's license even without a continued reason to detain the motorist. *See, e.g.*, *State v. Gulick*, 759 A.2d 1085, 1088 (Me. 2000) (holding "[a]fter an officer stops a vehicle, he may request verification of the operator's right to drive, even when the original reason for a stop has disappeared, or evaporated, before the request is made"); *Hart v. State*, 235 S.W.3d 858, 861 (Tex. Crim. App. 2007) (where the initial traffic stop is valid, a license check of the driver, even if conducted after the officer has determined that the motorist is not guilty of the violation for which he or she was originally stopped, is not unreasonable so long as it does not unduly prolong the motorist's detention); *State v. Williams*, 655 N.W.2d 462, 468 (Wis. 2002) (finding police had authority under state statute to require driver to display license on demand if driver was already stopped for lawful purpose).

Our supreme court's decision in *Jackson* aligns with the minority point of view. *Jackson*'s discussion of the officer's authority to ask the motorist to display his operator's license even after he was "exonerated" relies on Iowa Code section 321.174. 315 N.W.2d at 767. Subsection (3) of that statute requires a licensee to have his or her driver's license in immediate possession at all times when operating a motor vehicle and "to display the same upon demand" of a peace officer, judge, or DOT official. Iowa Code § 321.174(3). *Jackson* does not specifically address whether it is reasonable under the Fourth Amendment for the officer to prolong the detention of the motorist to demand his or her driver's license. 315 N.W.2d at 767.

The constitutionality of prolonging a traffic stop was discussed last year by the United States Supreme court in *Rodriguez* and the Iowa Supreme Court in *Pardee*. Those cases confirmed an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop" but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Pardee*, 872 N.W.2d at 393 (citing *Rodriguez*, 135 S. Ct. at 1615). In *Rodriguez*, the Court explained: "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, . . . and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614 (internal citations omitted).

In his supplemental brief, Coleman focuses on the "mission" discussion. In *Rodriguez*, the officer's mission was to find out why the defendant had veered off the road, not to investigate whether Rodriquez was carrying drugs, which is why the court concluded the officer had no reason to continue detaining Rodriguez once the officer determined the driver veered to miss a pothole and a warning ticket was issued. *Id*. at 1614-15. Coleman contends in his case, "[t]he mission of the stop was to determine if the registered owner was the driver and cite or arrest her for driving illegally. The mission was concluded as soon as the officer determined that the driver was not the registered owner."

By contrast, the State's supplemental brief emphasizes the "related safety concerns" language from *Rodriquez*. The State quotes the case's next passage:

> Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." . . . Typically such inquiries involve checking the driver's license,

determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.

*Id.* at 1615 (internal citations omitted).

The State acknowledges under *Rodriguez* and *Pardee*, an officer may not prolong a traffic stop to call for a drug-dog sniff or engage in other questioning aimed at detecting evidence of criminal wrongdoing, without suspicion. But the State asserts an officer may make "ordinary inquiries" such as asking for a driver's license and registration without violating the Fourth Amendment. The State categorizes those "ordinary inquiries" as checks that "relate to safety of the officer and those who share the road with the motorist." The State argues "even if the purpose of the stop—the traffic infraction—has dissipated, the traffic stop still presents a danger to the officer that justifies the typical inquiries."

The danger to peace officers inherent in traffic stops emerged as the key consideration for the Illinois Supreme Court as it recently confronted an almost identical factual scenario. *See Cummings II*, 46 N.E.3d at 251-52. Originally, a majority of the Illinois high court decided a police officer violated the Fourth Amendment when, after stopping a van solely because it was registered to a woman with an outstanding arrest warrant, the officer asked the male driver for his operator's license. *People v. Cummings* (*Cummings I*), 6 N.E.3d 725, 727, 733 (Ill. 2014) (holding "unless a request for identification is related to the reason for the stop, it impermissibly extends the stop and violates the Constitution"). The United States Supreme Court granted the government's petition for writ of certiorari, vacated the original decision, and remanded for further consideration in light of *Rodriguez*. *Illinois v. Cummings*, 135 S. Ct. 1892 (2015).

On remand, the Illinois Supreme Court unanimously held the officer's request for Cumming's license did not impermissibly prolong the traffic stop, even though reasonable suspicion had vanished when the officer saw the defendant was not the vehicle's registered owner. *Cummings II*, 46 N.E.3d at 252-53. The Illinois court read *Rodriguez* as reasoning "unrelated inquiries impermissibly prolong the stop beyond its original mission, when those inquiries are not precipitated by reasonable suspicion," but "[o]rdinary inquiries incident to the stop do not prolong the stop beyond its original mission, because those inquiries are a part of that mission." *Id.* at 252. Rejecting Cummings' argument that the State had not proven how checking the driver's license promotes officer protection, the Illinois court opined: "[W]here a traffic stop is lawfully initiated, the interest in officer safety entitles the officer to know the identity of a driver with whom he is interacting."

The State embraces the rationale in *Cummings II* decision, citing statistics showing the perils faced by officers during traffic stops and asserting: "An officer may choose to mitigate his risk by identifying the person he has met from license and registration, and it does little to impair the motorist's constitutional rights." It is true routine traffic stops raise a concern for officer safety, but "the threat to officer safety from issuing a traffic citation . . . is a good deal less than in the case of a custodial arrest." *Knowles*, 525 U.S. at 117. And arguably the threat to officer safety would be even less if the officer waved the motorist on with a brief explanation for the mistaken stop, rather than extending the encounter by asking for license, registration, and proof of insurance.

In his supplemental briefing, Coleman discusses *Cummings I* decision, arguing the Illinois court was correct in originally deciding when reasonable suspicion ended the seizure and continued investigation was unlawful. Coleman contends under the *Terry* standard, Officer Morris did not have "articulable facts" to reasonably warrant the intrusion of asking for his license after discovering he was not the car's registered owner. *See Terry*, 392 U.S. at 20; *see also Royer*, 460 U.S. at 498 (explaining person "may not be detained even momentarily without reasonable, objective grounds for doing so").

While Coleman's position has won over a majority of courts addressing this question in other jurisdictions, our supreme court has yet to expressly retreat from its position in *Jackson*. Moreover, the majority's analysis in *Rodriguez* may be read to approve of the sentiments in *Jackson* that there is "nothing illegal" about asking a driver to display his operator's license "once he was stopped and exonerated" because such an "ordinary inquiry" is part of the officer's "traffic mission." *See Cummings II*, 46 N.E.3d at 252.

The final chapters may yet be written on the constitutional question arising in this case. For instance, the United States Supreme Court may decide to directly address the application of *Rodriguez* to a factual scenario where the officer makes "ordinary inquiries" concerning license and registration after reasonable suspicion has vanished rather than amid a traffic stop based on reasonable suspicion or probable cause. Or the Iowa Supreme Court may decide to answer the question it left open in *Vance* regarding the propriety of an investigation after the initial purpose of an investigatory stop has been resolved. But for now, we are compelled to follow *Jackson* and decide the Fourth

Amendment did not prohibit Officer Morris from asking for Coleman's license despite the fact a mistake concerning the identity of the Pontiac Bonneville's registered owner led to the traffic stop.

**AFFIRMED.**

Bower, J., concurs; McDonald, J., concurs specially.

**MCDONALD, Judge.** (concurring specially)

I respectfully concur in the judgment of the court. I write separately, however, because I do not share the majority's apparent reluctance in concluding an officer's request for driver's license, registration, and proof of insurance following an undisputedly lawful traffic stop is constitutional.

I begin with first principles.

> The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. As the text indicates, the ultimate touchstone of the Fourth Amendment is reasonableness. We have defined reasonableness in objective terms by examining the totality of the circumstances and by considering the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing. When traditional protections have not provided a definitive answer, our precedents have analyzed a search or seizure in light of traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

*Rodriguez v. United States*, 135 S. Ct. 1609, 1617-18 (2015) (Thomas, J., dissenting) (internal marks and citations omitted).

I readily conclude the officer's request for Coleman's driver's license, registration, and proof of insurance was reasonable. The officer lawfully initiated a traffic stop. Although the officer's suspicion quickly dissipated upon realizing the driver was not of the same gender as the registered owner of the vehicle, the officer was allowed to conduct regulatory inquiry related to enforcement of the traffic laws and officer safety once there. The officer's ability to conduct such inquiry is justified, for constitutional purposes, by the government's legitimate interests in enforcement of the traffic laws and protecting officer safety when

balanced against the de minimis imposition upon the detained motorist. *See Virginia v. Moore*, 553 U.S. 164, 171 (2008) (determining reasonableness by balancing the legitimate governmental interests against the degree of intrusion on an individual's privacy). The government's interests in enforcement of the traffic laws and protecting officer safety exist independent of the officer's reason for initiating the traffic stop. *See Rodriguez*, 135 S. Ct. at 1616 ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular."). This is why, for example, an officer may ask for proof of insurance during the course of any lawfully initiated traffic stop even when the request for proof of insurance has no relation to the reason for the stop. *See, e.g., United States v. Gregory*, 302 F.3d 805, 809 (8th Cir. 2002) ("The Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration . . . ."). It necessarily follows then that, following a lawful stop, the officer always has independent justification for carrying out de minimis regulatory inquiry related to enforcement of the traffic laws and protecting officer safety, including a request for records related to operation of the vehicle.

This conclusion is squarely supported by *Rodriguez.* The Supreme Court clearly stated that "the mission" of any lawfully initiated traffic stop includes regulatory inquiry related to enforcement of the traffic law. *Rodriguez*, 135 S. Ct. at 1615 (stating an "officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop"). Further,

> an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the

driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Id.* (internal citations and marks omitted).

The two most relevant cases decided post-*Rodriguez* support the same conclusions. In *Pardee*, the Iowa Supreme Court stated, "[u]nrelated checks . . . are matters that do not 'serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.'" *In re Pardee*, 872 N.W.2d 384, 393 (Iowa 2015) (citation omitted). The Illinois Supreme Court applied the same basic framework in *Cummings*:

> We believe *Rodriguez* supports the State's interpretation. A traffic stop is analogous to a *Terry* stop, and its permissible duration is determined by the seizure's mission. The seizure's mission consists of the purpose of the stop—in *Rodriguez*, traffic enforcement—and related safety concerns. Those related safety concerns include 'ordinary inquiries incident to the traffic stop, and typically involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. Those checks serve also to enforce the traffic code.
>
> Ordinary inquiries within the traffic stop's mission clearly do not offend the fourth amendment.
> . . . .
> Defendant's view of the ordinary inquiries, that they must relate to the initial purpose of the stop, would be in direct conflict with *Holt's* officer safety justifications as favorably cited in *Rodriguez*. *Rodriguez* makes clear that unrelated inquiries impermissibly prolong the stop beyond its original mission when those inquiries are not precipitated by reasonable suspicion. Ordinary inquiries incident to the stop do not prolong the stop beyond its original mission, because those inquiries are a part of that mission. Indeed, defendant's view would collapse the two parts of the mission—the initial purpose of the stop and ordinary inquiries of the stop—into just the purpose of the stop. Nothing in *Rodriguez* suggests that license requests might be withdrawn from the list of ordinary inquiries for a nontraffic enforcement stop.

*People v. Cummings*, 46 N.E.2d 248-251-52 (Ill. 2016) (internal citations and marks omitted).

The conclusion that the officer's request for records during a lawfully initiated traffic stop is independently justified without regard to the purpose of the stop and without regard to whether the officer's reasonable suspicion is confirmed has been noted by at least one commentator:

> As one court has aptly put it, the "primary law enforcement purposes" for making a traffic stop are: "(1) to verify that a violation of the traffic laws has occurred or is occurring and, (2) to provide for the issuance of an appropriate ticket or citation charging such traffic violation or make an arrest of the driver based upon such violation." This being the case, it might be thought that a close application of the *Terry* doctrine to traffic stops would mean that the police could not use the occasion to check, via radio or computer, various government records concerning the status of the driver and the vehicle; rather, the officer should merely investigate sufficiently to verify (where necessary) that his pre-stop suppositions about the violation are correct (sometimes they are not) and then simply proceed with citation or arrest. But the court responsible for the above-quoted pronouncement followed it with this postscript: "In furtherance of these purposes, the police officer is authorized to require the driver of the vehicle to produce a valid driver's license and documentation establishing the ownership of the vehicle and that required public liability insurance coverages are in effect on such vehicle," after which "the officer may run a computer check on the driver's license and registration." This kind of checking of government records incident to a "routine traffic stop," which usually takes a matter of minutes, is well established as a part of the "routine," and has consistently been approved and upheld by both federal and state courts.

Wayne R. LaFave, *The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1874-75 (2004) (footnotes omitted).

As the majority concludes, *Jackson* is the controlling case. The rationale of *Jackson* has not been undermined by subsequent doctrinal developments. To

the contrary, *Jackson* is rooted in long-standing Fourth Amendment principles. Those principles were reaffirmed in *Rodriguez* and *Pardee*.  I concur in the judgment.