# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2979
No. 02-3125

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee/Cross-Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Western District of Arkansas. |
| Donnie R. Long, | * |
| | * |
| Appellant/Cross-Appellee. | * |

_____

Submitted: January 14, 2003

Filed: February 18, 2003

_____

Before BOWMAN, RICHARD S. ARNOLD, and BYE, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Donnie Long, convicted of being a felon-in-possession of a firearm, appeals the denial of his pretrial motion to suppress evidence discovered during a traffic stop that he argues was without constitutional justification. The government cross-appeals, contending that Long's sentence should have been enhanced pursuant to the Armed Career Criminal Act. We affirm the denial of the motion to suppress, but we reverse with respect to the sentencing issue and remand for re-sentencing.

I.

On January 16, 2001, four law enforcement officials—two agents from the Bureau of Alcohol, Tobacco, and Firearms (ATF); one Hot Springs, Arkansas, police officer; and one Arkansas State Police officer—were jointly conducting illegal drug and firearm surveillance at a Hot Springs residence. A Cadillac arrived at the residence at one point in the afternoon, and its driver and at least one passenger entered the residence before returning to the Cadillac. The officers followed the Cadillac to a second residence, where one passenger got out of the car, entered the residence, and returned shortly to the car. One of the surveillance officers recognized this residence as the site of an undercover drug transaction that occurred just one month earlier. The Cadillac continued to a third residence, another site of a recent undercover drug transaction. A passenger got out of the car, entered this residence, went inside another nearby residence, and returned to the car.

After the Cadillac pulled away from the third residence, one of the surveillance officers—Hot Springs officer Rick Norris—noticed that the Cadillac displayed an expired Arkansas dealer plate. Norris wrote down the plate number and radioed to Hot Springs Police Officer Frank Abbott (who was not part of the surveillance team). Norris told Abbott about the surveillance operation and the expired plate. He then asked Abbott to stop the Cadillac. After confirming with the Hot Springs Police Department that the dealer plate had expired, Abbott signaled to the driver of the Cadillac to pull over. The Cadillac pulled into a parking lot. Abbott followed. The surveillance officers arrived soon thereafter.

Abbott approached the car and asked the three men in the car for identification. He also asked the driver, Long, for the vehicle's registration and proof of insurance. Long and one passenger produced identification, but the other passenger did not, and Long did not provide the vehicle's registration. Abbott ran the information from Long and the passenger through his Arkansas Crime Information Center computer

and learned that Long was on parole. Long's parolee status made Abbott scrutinize the situation more carefully because, in Abbott's experience, the computer system could fail to report a parolee's outstanding warrant.

At this point, the Arkansas State policeman (Scotty Dowd) and an ATF agent (Warren Newman) brought Long's two passengers to the rear of the Cadillac. Because he had not yet verified the identity of one of the passengers, Abbott stopped speaking with Long and joined Dowd and Newman in questioning the passengers. Norris and ATF agent John Carlton then began talking to Long, who was still seated in the car, gripping the steering wheel. Long frequently looked over his shoulder during his conversation with Norris and Carlton, who both described Long as nervous.

Norris and Carlton soon asked Long to step out of the Cadillac. When Long stood up, Norris saw a bulge on the left side of Long's jacket and noticed that the left side of the jacket hung lower than the right side. Concerned that the jacket might contain a weapon, Norris and Carlton performed a pat-down search. They found a .32-caliber pistol in the jacket and arrested Long. According to Norris, the arrest took place approximately five minutes after the traffic stop began. In addition to being arrested, Long was written a citation for driving with expired plates. Abbott did not testify as to the precise time at which he wrote the citation, but it was before the arrest.

Long unsuccessfully moved to suppress the pistol on the grounds that the traffic stop and the officers' continued questioning were unjustified under the Fourth Amendment. A jury then convicted Long of being a felon-in-possession of a firearm. At sentencing, the government asked the District Court to apply the sentencing guidelines' Armed Career Criminal Act (ACCA) enhancement, which applies if Long had three prior convictions for either a "violent felony" or a "serious drug offense." See 18 U.S.C. § 924(e)(1) (2000), cited in U.S. Sentencing Guidelines § 4B1.4

(2002). Although Long was convicted in 1996 of three counts of delivery of a controlled substance, the District Court did not apply the ACCA enhancement. It reasoned that Long had been "convicted" only once for purposes of the ACCA primarily because Long's 1996 convictions took place in a single proceeding. Long appeals the denial of his motion to suppress, and the government cross-appeals the District Court's decision not to apply the ACCA enhancement.

## II.

Long argues that the pistol found in his jacket should be suppressed because Abbott effected the traffic stop without probable cause to believe that Long had violated a traffic law. Alternatively, he argues that his detention at the stop was unreasonable in length under the Fourth Amendment. We evaluate each argument in turn.

## A.

Any traffic stop is constitutional, no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred. See Whren v. United States, 517 U.S. 806, 813 (1996). The District Court found that Abbott had probable cause to believe that Long was violating section 27-14-304 of the Arkansas Code, which requires all vehicles to display valid plates for the current registration year. See Ark. Code Ann. § 27-14-304 (Michie 1994). We review the District Court's determination of probable cause de novo. See United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002).

According to Long, section 27-14-304 was temporarily suspended at the time of his arrest as the result of an order of the Arkansas Department of Finance and Administration (DFA) that permitted the renewal of dealer plates without penalty for thirty days following the plates' expiration. The dealer plates on Long's car expired

on December 31, 2000, and the date of the traffic stop was January 16, 2001. Because Abbott knew that Long's expired plates were within the grace period for renewal without a fee, Long argues that Abbott understood that section 27-14-304 was ineffective as to the plates on the Cadillac, and he therefore lacked the probable cause necessary to make the traffic stop.

We agree with the District Court that section 27-14-304 was not nullified, amended, or repealed by the DFA's grace period. Section 27-14-304 is unambiguous: every vehicle must display a valid plate, "except as otherwise expressly permitted in this chapter." We have reviewed Chapter 14 of Title 27 of the Arkansas Code and did not find any provision for a grace period. Furthermore, section 27-14-601(a)(6) of the Arkansas Code, which concerns registration and fees for dealer plates, makes no mention of a grace period. See Ark. Code Ann. § 27-14-601(a)(6) (Michie Supp. 2001). Long offers no evidence that the DFA, the Arkansas legislature, or the Arkansas courts intended for the grace period to invalidate section 27-14-304. Abbott thus had probable cause to believe that Long was violating this statute.

Even if we found that section 27-14-304 was ineffective during the grace period, the traffic stop would still have been constitutional because Abbott should not be held responsible for anticipating the statute's invalidity. We reach this conclusion based on a principle announced by the Supreme Court in Michigan v. DeFillippo, 443 U.S. 31 (1979). In DeFillippo, the defendant argued that a traffic stop was unconstitutional because the law upon which the stop was based was unconstitutional; thus, according to the defendant, the officer could not have had probable cause to make an arrest based on an unconstitutional law. The Supreme Court concluded otherwise:

> Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its

constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not . . . entitled to enforcement.

Id. at 38.

This reasoning applies here even though Long's challenge to section 27-14-304 is not constitutionally-based. Because no court has ever found that the DFA grace period invalidates, amends, nullifies, or repeals section 27-14-304, Abbott had no duty to speculate that section 27-14-304 was not in effect. To invoke language from DeFillippo, no officer of "reasonable prudence" should be expected to believe that an administrative rule concerning license plate fees would render a traffic law unenforceable. Abbott's duty is to enforce the laws, not to determine their validity. The traffic stop was therefore justified.

B.

An officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle, and ask routine questions concerning the driver's destination and the purpose of his trip. United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002). Long's second claim is that the questioning by Norris and Carlton that ultimately led to the discovery of the pistol was not related to any of these permissible traffic stop activities. According to Long, the traffic stop ended after Abbott issued him a citation and learned the identities of his passengers. At that moment, the stop became purely investigative, and the officers needed reasonable suspicion that Long or his passengers were subject to seizure under applicable laws in order to continue their questioning. See United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999) (quoting

Delaware v. Prouse, 440 U.S. 648, 655 (1979)), cert. denied, 528 U.S. 1161 (2000). Long contends that the officers lacked this reasonable suspicion.

We first note that the initial questioning by Norris and Carlton was entirely reasonable as part of the traffic stop. At the time when Norris and Carlton began speaking with Long, Abbott was still ascertaining and verifying the identities of the passengers as well as waiting for a check on Long's parole status. In addition, Norris and Carlton approached Long within just one minute of Abbott ending his conversation with Long. Moreover, the purposes of their questioning—to determine the reasons for Long's trip and his destination—were legitimate for a traffic stop.

The crux of Long's argument, however, is that Abbott quickly verified the identities of the passengers, learned that no warrant was out for Long's arrest, and wrote a citation to Long for the expired plates, leaving the officers—including Norris and Carlton—without any reason to continue their questioning. But our review of the record does not show a particular moment when the traffic stop ended and an investigative stop began. Abbott testified that he issued a citation to Long at some point before the arrest, but he did not identify the precise time at which he wrote the citation, nor did Long's counsel ask him to do so at the suppression hearing. Because there is no testimony as to when the officers completed their routine traffic stop duties, we could conclude that the stop never became entirely investigative in nature. In that case, the officers could have requested that Long exit the Cadillac without any additional justification. See Pennsylvania v. Mimms, 434 U.S. 106, 109–111 (1977) (holding officers at traffic stop have right to ask driver to exit car). The pat-down search would have required reasonable suspicion that Long had a weapon, but Long does not challenge the validity of that search.

Given, however, that Abbott wrote the citation and verified the identities of the passengers, we recognize that the stop at some point became purely investigative in nature. In fact, Norris and Carlton both testified that one purpose of the stop was to

-7-

investigate whether Long and his passengers had been involved in illegal drug and firearm activity. That the stop became investigative is not an issue—an investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop. Gregory, 302 F.3d at 809. At issue is whether the officers had the reasonable suspicion of criminal activity necessary to investigate further. We examine the totality of the circumstances, in light of all of the officers' experiences, to determine whether or not they did. See United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002).

Even under this reasonable suspicion standard, we conclude that the stop was reasonable. Norris and Carlton had followed the Cadillac to two residences known to be sites for illegal drug sales. In addition, Long acted nervously, gripping the steering wheel while frequently looking over his shoulder. Taken together, these facts create a reasonable likelihood that Long had been involved in illegal drug or firearm dealings during his drive and that he was nervous because he was attempting to cover up evidence of wrongdoing. These facts also create a plausible concern for officer safety. If Long was coming from a drug or firearm transaction, a reasonable officer might conclude that Long could have a firearm at his immediate disposal (which we know now that he did). It was therefore reasonable for Norris and Carlton to ask Long to exit the car.

Long's brief to this Court is unclear as to whether he also challenges as unconstitutional the total length of the entire stop. Even if he does, we find no merit to that claim. A traffic stop is not subject to length-of-detention analysis, $404,905.00 in U.S. Currency, 182 F.3d at 648, and the investigative portion of the stop, at whatever moment it began, appears to have lasted no more than five minutes or so, a reasonable length for a properly-justified investigative stop. See, e.g., Linkous, 285 U.S. at 721 (concluding that length of detention was reasonable when nineteen minutes elapsed between start of traffic stop and arrest).

We recognize that the line that separates a traffic stop from an investigative stop is generally difficult to draw and artificial. See $404,905.00 in U.S. Currency, 182 F.3d at 648. We therefore put no great stock in using this line as the basis for our conclusion as to the stop's reasonableness. See id. at 649 ("When the constitutional standard is reasonableness measured by the totality of the circumstances, we should not be governed by artificial distinctions."). We are satisfied the stop was justified and reasonable in scope and length from its inception as a traffic stop through the arrest, no matter the specific moment at which the stop became purely investigative.

III.

In a cross-appeal, the government contends that the District Court should have enhanced Long's sentence pursuant to the Armed Career Criminal Act (ACCA). If the ACCA enhancement applies, Long's incarceration would increase from 51 months to a period in the range of 188 to 235 months, and his supervised release period and the fine imposed on him would also rise. We review the District Court's application of the sentencing guidelines de novo. United States v. Waldman, 310 F.3d 1074, 1079 (8th Cir. 2002).

The ACCA enhancement applies to Long if he "has three previous *convictions* . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1) (emphasis added). The District Court concluded that Long was previously convicted of only one serious drug offense—a 1996 conviction for three counts of delivery of a controlled substance, with each count based on a separate delivery. The District Court reasoned that Long's guilty plea to the three delivery counts constituted a single conviction because he pleaded guilty to all three counts in a single proceeding, because Long's Judgment and Commitment Order listed only one offense date, and because Long received a single ten-year sentence for all three deliveries rather than one sentence for each delivery.

The District Court's analysis and conclusion is contrary to this Circuit's law that the ACCA is triggered by the criminal episodes that underlie a defendant's convictions. See United States v. McDile, 914 F.2d 1059, 1061 (8th Cir. 1990), cert. denied, 498 U.S. 1100 (1991). In McDile, we considered whether the ACCA applied to a defendant with two prior serious drug convictions, each of which involved two separate drug sales. We held that each drug sale was a distinct criminal act and that, having pleaded guilty to each offense, the defendant had been "convicted" of four serious drug offenses within the meaning of the ACCA. Id.

McDile controls this case. Long made three separate deliveries of a controlled substance on three separate days, so each delivery constitutes a "conviction" of a serious drug offense for ACCA purposes. Although it lists one offense date, the Judgment and Commitment Order supports our conclusion because it states that Long pleaded guilty to three delivery counts, not to one count. The District Court was in error to conclude that Long's three violations merged into just one because the convictions occurred in the same proceeding and because Long received a single sentence that accounted for all three convictions.

Because Long has three previous convictions for serious drug offenses, the ACCA enhancement applies. We therefore remand the case to the District Court so that it can re-sentence Long in accordance with the ACCA enhancement.

IV.

We affirm the judgment of the District Court with respect to the denial of Long's motion to suppress, but we reverse the District Court's sentence for its failure to apply the ACCA enhancement. The case is remanded for re-sentencing consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.