# IN THE COURT OF APPEALS OF IOWA

No. 3-1210 / 13-0230
Filed February 5, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JACKIE DEAN KNIGHT,**
        Defendant-Appellant,
_____

        Appeal from the Iowa District Court for Webster County, Thomas J. Bice,

Judge.


        A defendant appeals his convictions for drug and tax stamp offenses,

operating while intoxicated, and escape.  **AFFIRMED.**


        Alfredo Parrish and Eric Parrish of Parrish, Kruidenier, Dunn, Boles,

Gribble, Gentry & Fischer, L.L.P., Des Moines, for appellant.

        Thomas J. Miller, Attorney General, Kyle Hanson, Assistant Attorney

General, Ricki L. Osborn, County Attorney, and Jennifer Bonzer and Jennifer

Benson, Assistant County Attorneys, for appellee.


        Considered by Doyle, P.J., and Tabor and Bower, JJ.

**TABOR, J.**

Jackie Dean Knight challenges the traffic stop that resulted in his six convictions, arguing the peace officer had neither probable cause nor reasonable suspicion to stop him when he had a valid temporary registration. He also renews his chain-of-custody objection to three drug exhibits offered by the State.

Because the stop resulted from a reasonable mistake of fact, the officer did not violate Knight's constitutional rights. In regard to the exhibits, we find no abuse of discretion in the district court's ruling that any discrepancies in the descriptions or measurements of the drugs affected the weight they should be given by the jury and not their admissibility.

## I. Background Facts and Proceedings

At 3:45 a.m. on October 21, 2011, Webster County Deputy Sheriff Joshua Van Waes saw a 2003 red Buick Rendezvous stopped at a stop sign in Fort Dodge. Because the Buick had neither a front nor a rear license plate, the officer turned on his emergency lights and followed the car into an alley. Both the driver, who was later identified as Jackie Knight, and his passenger got out of their vehicle and began walking toward the squad car with their arms raised. Van Waes told them to get back in the vehicle.

Because the alley was not well lit, for his safety the deputy trained his squad car's spotlight on the Buick. As Van Waes approached the vehicle, he noticed a white piece of paper behind the darkly tinted rear window that "could possibly be a temporary registration tag or something along those lines." The

deputy had not seen the sticker until he illuminated the window and moved closer to the Buick.

Van Waes continued to the driver's window and talked to Knight about why he had stopped him. During that conversation Van Waes detected the odor of alcohol coming from the vehicle and saw that Knight's eyes were bloodshot and watery. Van Waes asked Knight to get out of the vehicle and was able to confirm the smell of alcohol. At that point, the deputy also noticed Knight's speech was slurred. Knight eventually admitted he had been drinking but recalled having only two Bud Light beers. Knight then took the field sobriety tests; his performance indicated impairment.

When the deputy told Knight he was under arrest for operating while intoxicated (OWI), Knight sprinted away. The deputy chased him on foot, yelling: "Stop or you'll be tased." When Knight did not stop, the deputy "drew [his] Taser and activated it." The electrical current deflected off Knight's heavy winter coat but did not incapacitate Knight. Instead, Knight tripped on a curb, and Van Waes tackled him to the ground. When Knight reached for his left waistband, a second deputy on the scene "tased" him. Knight screamed: "I give up."

After placing Knight in handcuffs, Van Waes searched him, finding two plastic baggies of "a white powdery substance" in his left jeans pocket. In the right front pocket of Knight's coat, the deputy found another baggie—this one containing "a green leafy substance." The deputy found "a whole bunch of cash" wedged into Knight's right jean pocket. In another pocket the deputy found a

"neon green" plastic container with a screw-on lid that held "another brown kind of rock-like substance that [the deputy] was unfamiliar with."

On December 2, 2011, the State charged Knight with the following six criminal counts: (1) possession of cocaine with intent to deliver, in violation of Iowa Code section 124.401(1)(c)(2)(b) (2011); (2) a drug tax stamp violation under sections 453B.1, 453B.3, and 453B.12; (3) possession of marijuana with intent to deliver, in violation of section 124.401(d)(1); (4) OWI, in violation of section 321J.2; (5) escape, in violation of section 719.4(2); and (6) possession of cocaine base with intent to deliver, in violation of section 124.401(1)(c)(3). The drug-related charges all carried the habitual felon enhancement under sections 902.8 and 902.9.

On February 10, 2012, Knight filed a motion to suppress evidence obtained as a result of the traffic stop, arguing it was an illegal seizure. Following a March 16, 2012 suppression hearing, the district court denied the motion on March 28, 2012. Knight then sought an interlocutory appeal, which our supreme court denied.

On October 16, 2012, a jury trial commenced. On October 19, 2012, the jury returned a verdict of guilty on all counts. On January 11, 2013, the district court sentenced Knight to fifteen years in prison with a minimum one-third on counts one and six, and a three-year minimum on counts two and three. The court ordered the sentences to run concurrently. Knight now appeals, alleging the deputy's stop was an unreasonable seizure and challenging the district court's admission of three exhibits.

**II.      Scope and Standards of Review**

We review suppression rulings based on constitutional arguments de novo.  *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011).

We review the admission of evidence over a chain of custody objection for an abuse of discretion.  *State v. Biddle*, 652 N.W.2d 191, 196 (Iowa 2002). Unless there is a clear abuse of discretion in such a ruling, we will not overturn it. *Id.*

**III.      Analysis**

**A.      Did law enforcement violate the federal or state constitutions in stopping Knight's car when the deputy did not see the temporary registration until after the seizure occurred?**

Knight argues the stop of his vehicle violated the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. He claims the facts in his case are similar to *State v. Tyler*, 830 N.W.2d 288, 296 (Iowa 2013), in which the supreme court recently reversed a criminal conviction because the officer made a mistake of law, or alternatively a mistake of fact that was not objectively reasonable, when stopping Tyler based on his tinted license plate cover.  The State disputes Knight's claim, arguing the situation is governed by *State v. Lloyd*, 701 N.W.2d 678, 680 (Iowa 2005), rather than *Tyler*.  We agree *Lloyd* controls here.

In *Lloyd*, a deputy stopped a car at 2:20 a.m. because it did not have permanent license plates.  701 N.W.2d at 679.  As it turns out, Lloyd had a valid temporary plate taped to his car's rear window, but the deputy "simply missed the temporary plate at the time of the stop."  *Id.*  In a per curiam decision, the Iowa

Supreme Court held the deputy's objectively reasonable mistake of fact did not invalidate the stop that otherwise was based on probable cause to believe Lloyd was operating his car without license plates. *Id.* at 681–82.

The *Tyler* court did not back away from *Lloyd*. *Tyler*, 830 N.W.2d at 292, 294 (citing *Lloyd* for the proposition "A reasonable mistake of fact does not negate justification for a stop based on probable cause" and confirming "Our precedent[1] is clear that a mistake of fact may justify a traffic stop"). Rather, *Tyler* decided the officer made a mistake of law when he wrote in his report that the tinted license plate cover violated provisions in chapter 321. *Id.* at 294. Mistakes of law cannot provide probable cause to justify a traffic stop. *State v. Louwrens*, 792 N.W.2d 649, 652–54 (Iowa 2010). The *Tyler* court also found "no objectively reasonable fact" that would support the officer's contention that his view of the license plates was obstructed. 830 N.W.2d at 297.

In the instant case, the district court concluded Deputy Van Waes acted reasonably when he stopped the car for not having license plates.

---

[1] That precedent includes the following cases: *State v. Kinkead*, 570 N.W.2d 97, 101 (Iowa 1997) (finding officer's mistaken belief muffler was excessively loud was "merely a factor to consider in the reasonable suspicion analysis"); *State v. Melohn*, 516 N.W.2d 24, 25 (Iowa 1994) (holding it was reasonable for police to stop a vehicle speeding away from the vicinity of gunshots, even though the facts later showed the individual was not involved in the gunfire); *State v. Jackson*, 315 N.W.2d 766, 767 (Iowa 1982) (also upholding stop of a vehicle for failure to display license plates, even though the officer later learned the vehicle was displaying proper temporary plates); *State v. Ewoldt*, 448 N.W.2d 676, 678 (Iowa Ct. App. 1989) ("Information sufficient to establish reasonable cause to stop is not defeated by an after-the-fact showing that the information was false.").

Here, the traffic stop was made at 3:45 a.m. in a part of Fort Dodge known for drug dealing. The back window of the Defendant's car was tinted. The car had no plates. The temporary registration sticker in the rear window was not visible without use of a spot light.

Knight does not dispute those facts but argues Van Waes saw the temporary license plate before making contact with him, and therefore lacked probable cause to continue the seizure. Knight contends *Lloyd* and *Jackson* are factually distinguishable because in both of those cases the officer made contact with the driver before seeing the temporary registration. *See Lloyd*, 701 N.W.2d at 681–82; *Jackson*, 315 N.W.2d at 767. That factual distinction is clearer in *Jackson* than it is in *Lloyd*. But even assuming the officers in both *Jackson* and *Lloyd* spoke to the drivers before realizing they were factually mistaken about the temporary plates, we do not believe the different sequence of events means Van Waes acted unreasonably in going to the driver's window to explain his mistake and ask for Knight's license.[2] *See Jackson*, 315 N.W.2d at 767 ("Notwithstanding the fact that a mistake concerning the license plates led to the defendant's stop there was nothing illegal about the fact that, once he was stopped and exonerated, he was asked to display his operator's license."). Moreover, Knight's own briefing suggests it would be "a matter of common courtesy" for the officer to explain to the driver the reason for the initial stop, even

---

[2] In his reply brief, Knight cites *State v. Hollie*, No. 12-0727, 2013 WL 3291861, at *1 (Iowa Ct. App. June 26, 2013), and contends our court "expressly rejected Van Waes' reasoning as a basis for detaining a vehicle." Contrary to Knight's contention, *Hollie* is not like the present case. In *Hollie*, our court found the stop was invalid from its inception because the officer saw the driver's temporary registration was displayed but still made the stop based on a generalized suspicion that "[p]eople alter those all the time so we pull them over just to make sure."

if the officer did not have cause to ask for license or registration. *See United States v. Edgerton*, 438 F.3d 1043, 1044 (10th Cir. 2006).

Even assuming the deputy could do no more than tell the driver why he had made the stop and then allow him to be on his way, once the deputy smelled alcohol and saw Knight's eyes were bloodshot and watery during that conversation, the deputy developed reasonable suspicion to launch an investigation into possible drunk driving. An investigative detention can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis of the stop. *See State v. Aderholdt*, 545 N.W.2d 559, 564 (Iowa 1996); *see also United States v. Long*, 320 F.3d 795, 799–800 (8th Cir. 2003). The question is whether Van Waes had reasonable suspicion of criminal activity to investigate further. We believe once the deputy noticed indicia of alcohol consumption, especially considering the early morning hour, he was entitled to ask Knight if he had been drinking, and when Knight admitted he had, the deputy could proceed to the field sobriety tests. *See State v. Marks*, 644 N.W.2d 35, 38 (Iowa Ct. App. 2002) (finding reasonable suspicion based on officer "detecting odor of alcohol, watery, bloodshot eyes" and driver's admission to consuming beer).

Furthermore, even assuming the initial stop and arrest of Knight was invalid, Knight's attempt to flee and resistance when the deputy tried to handcuff him provided independent grounds for his arrest, and the evidence discovered during the subsequent search of his pockets was not subject to suppression.

*See State v. Dawdy*, 533 N.W.2d 551, 556 (Iowa 1995) (upholding search as valid incident to arrest). In our de novo review of the suppression record, we find no basis to reverse the district court's ruling.

**B.     Did the district court abuse its discretion by admitting three drug exhibits into evidence over Knight's chain of custody objections?**

Knight challenges the chain of custody of the drug evidence found in his pockets after he escaped from Deputy Van Waes while being placed under arrest. He contends the district court abused its discretion in admitting State's Exhibits 15, 17, and 18 into evidence because the State failed to offer sufficient proof their contents were "in the same condition when analyzed and introduced as when taken" from him.

To establish a chain of custody adequate to justify admission of physical evidence, the State must show its agents handled the items in a manner making it "reasonably probable that tampering, substitution or alteration of evidence did not occur." *Biddle*, 652 N.W.2d at 196. "Absolute certainty is not required." *Id.* The State bears a heavier burden when offering drug evidence, which is susceptible to tampering. *Id.* When the district court finds the State has established a sufficient foundation for admitting the physical evidence, "any speculation to the contrary affects the weight and not the admissibility of the evidence." *Id.* at 196–97. In deciding if a sufficient foundation exists, a district court may presume State agents would not tamper with evidence. *State v. Peck*, 329 N.W.2d 680, 686 (Iowa Ct. App. 1982). Similarly, when the record shows the disputed evidence was sent to the DCI crime lab and handled in conformity with the rules governing the lab, the district court is entitled to presume the

evidence was not tampered with during transport to and from the lab and while at the lab. *See State v. Ramirez*, 485 N.W.2d 857, 859 (Iowa Ct. App. 1992).

In addressing Knight's chain-of-custody argument, we will first recount the testimony of the State's witnesses regarding the overall collection of the drug evidence. We will then focus on Knight's particular concerns about each exhibit.

Incident to Knight's arrest, Deputy Van Waes found two plastic baggies of a "white powdery substance" in Knight's left jean pocket. He located one baggie of a "green leafy substance" in Knight's right front coat pocket. And the deputy found a "neon green" plastic container with a "brown kind of rock-like substance" in another pocket. After seizing these items from Knight, Van Waes handed them to Fort Dodge Police Officer Tom Steck.

While Van Waes escorted Knight to his police vehicle, Steck placed the collected items in individualized brown paper sacks, locked them in the trunk of his own squad car, drove around the block, and pulled up behind Van Waes's squad car. Steck then placed the bags containing the evidence onto the passenger side floor of Van Waes's car and locked the door. Van Waes drove the items to the station, did a property inventory, and secured them in an evidence locker.

The property inventory, dated October 21, 2011, identified the case number as 11-0718 and the suspect as Jackie Knight. The inventory listed the following four items: (1) "12 grams of a white powder substance" found in "left jean pocket" (2) "28 grams green leafy substance (marijuana)" found in "right coat pocket"; (3) "green plastic container w green substance" found in "pocket";

(4) "$680.00 cash" found in "right jean pocket." Deputy Van Waes placed the two baggies containing a white powdery substance (introduced into evidence as Exhibit 15) onto the scale in the station's booking room and determined they weighed 12 grams. Van Waes "bundled" the seized items together in a single sealed bag with an attached log sheet. Van Waes testified that either he or Lieutenant Kevin Kruse, the sheriff's department evidence custodian, had the key to the locker.

Van Waes later retrieved the green leafy substance he believed to be marijuana from the evidence locker and transferred it to Lieutenant Anita Guthrie of the Fort Dodge police department for testing. Her testing occurred on October 23, 2011. She determined the substance (introduced into evidence as Exhibit 17) to be 26.5 grams of marijuana. Guthrie also tested the "resin-like substance" in the plastic container (introduced into evidence as Exhibit 18) but did not find it tested positive for marijuana. She explained her lab was not capable of testing for the presence of hashish, only for the marijuana plant substance. When Guthrie's testing was done, Michael Buske, the evidence custodian for the Fort Dodge police department, returned the substances to the sheriff's evidence locker.

Lieutenant Kruse logged the evidence into the computer and kept it locked in the sheriff's evidence room. At Deputy Van Waes's request, Kruse sent the baggies containing the white powdery substance (Exhibit 15) and the small container with the dark rock-like substance (Exhibit 18)—by certified mail—to the Iowa Division of Criminal Investigation (DCI) laboratory for testing. Kruse sent

the baggies of white powdery substance on October 25, 2011, and the container with the dark rock-like substance on May 2, 2012.

Upon receipt and in compliance with DCI lab procedures, each substance was assigned a number, given a bar code, and kept in secure lockers. DCI criminalist Megan Kelly tested both substances. Her chemistry report for the white powdery substance, dated October 30, 2011, showed one baggie contained "white rock-like substance" weighing 4.21 grams and testing positive for "cocaine base" and the other baggie contained a "white substance" weighing 4.86 grams and testing positive for "cocaine hydrochloride." Kelly's test results for the "brown rock like substance"—dated May 10, 2012—showed a net weight of .66 grams testing positive for "marijuana in a form commonly known as hashish." Both of her reports showed an agency case number of 11-0718, the suspect name of Jackie Knight, and the offense date of October 21, 2011. Lieutenant Kruse received the evidence back from the DCI lab and kept it in the evidence locker until trial.

### 1. Exhibit 15

During the direct examination of criminalist Kelly, the State introduced Exhibit 15, a plastic bag holding two smaller baggies both containing white powdery substances. According to the DCI lab report, one baggie contained cocaine hydrochloride and the other contained cocaine base. At trial, defense counsel voir dired Kelly about the difference in weight recorded by Van Waes on the property inventory sheet (12 grams for both baggies) and the weight she recorded at the DCI lab (4.86 grams for one baggie and 4.21 grams for the other

baggie), and then lodged an objection based on chain of custody. Counsel argued: "[C]learly there has been opportunities to mess this evidence up; and this is pretty much borne out through the fact that you have big differences in what was seized or claimed to have been seized and what these officers and particularly Miss Kelly has testified about what she received."

The district court overruled the chain-of-custody objection, adding: "[T]he receipt of that exhibit is not at Defendant's prejudice in the fact that I will permit you to argue and to present to the jury in your final argument these inconsistencies you perceive and to argu[e] them accordingly."

On appeal, Knight argues the State failed to present any evidence to explain the "significant weight difference" of 2.93 grams (12 grams minus 9.07 grams). Knight also faults Van Waes for not mentioning any "white rock-like substance" on the property inventory when the DCI report included that description for the contents of one baggie. We find neither the weight discrepancy nor the less-than-identical descriptions of the cocaine rise to the level of a chain-of-custody violation.

Van Waes testified both baggies contained "some rock-like substances and then some kind of powder" but he quipped it was "above [his] pay scale" to identify exactly what the substances were. The descriptions by the deputy and the criminalist were not so markedly different as to raise an inference of a break in the chain of custody. As one federal circuit court aptly observed: "These minor discrepancies can be attributed to the inevitable differences in human perception, and we will not require the police and laboratory chemists to use precisely the

same words in referring to evidence before it may be admitted." *United States v. Dent*, 149 F.3d 180, 189 (3rd Cir. 1998); *see also McChristian v. State*, 20 S.W.3d 461, 464-65 (Ark. Ct. App. 2000) (viewing officer's description of "six rocks" of crack cocaine versus chemist's description of "a hard off-white rock-like substance" as a conflict properly weighed by the fact finder rather than a failure to show chain of custody).

As for the weight variance, Lieutenant Kruse testified it was common for deputies to weigh drugs in their packaging while the DCI criminalists weigh them without packaging. Kruse also testified the more accurate and official weight is determined by the DCI lab. In addition, state narcotics agent Patrick Waymire provided expert testimony that it was not unusual for the "field weight" and the DCI lab's testing weight to be several grams off. The district court could have reasonably considered these explanations for the weight discrepancies in overruling Knight's chain-of-custody objections.

Numerous courts from other jurisdictions have upheld the admissibility of drug evidence when faced with similar defense challenges based on weight variations. *See, e.g.*, *United States v. Lothridge*, 332 F.3d 502, 504 (8th Cir. 2003) (finding chain of custody existed despite fact that crack cocaine was analyzed at three different weights (41.16 grams, 35.86 grams, and 36.00 grams) in preparation for trial); *Guydon v. State*, 39 S.W.3d 767, 771 n.1 (Ark. 2001) (noting slight variation in weight of drug exhibits could result from "differing sensitivity in the scales" used by the officer and the lab technician); *Jones v. State,* 105 S.W.3d 835, 837 (Ark. Ct. App. 2003) (finding no abuse of discretion

in admitting drugs when the weight difference between the police officer's calculations (59 pounds) and the chemist's calculations (42 pounds) were explained by the officer); *Garcia v. State*, 721 So. 2d 1248, 1248 (Fla. Dist. Ct. App. 1998) (finding cocaine properly admitted despite discrepancy between officer weighing cocaine with packaging and chemist weighing drug alone); *Horne v. State*, 733 S.E.2d 487, 488 (Ga. Ct. App. 2012) (finding difference between cocaine's field weight (20.6 grams) and crime lab weight (17 grams) not sufficiently material to require exclusion on chain-of-custody grounds where arresting officer weighed drug in packaging and chemist weighed it out of the package); *People v. Quintanilla*, 2001 Guam 12 ¶ 33-35 , 2001 WL 641664, at *10 (Guam 2001) (rejecting argument that "six grams of allegedly missing methamphetamine called the integrity of the evidence into dispute" and crediting chemist's testimony that difference in weight "could be attributed to the weight of the packing holding the substance"); *People v. DeLuna*, 777 N.E.2d 581, 601 (Ill. App. Ct. 2002) (rejecting chain-of-custody challenge when difference between cocaine's field weight (1,084 grams and 1,743 grams respectively) and lab weight (983 grams and 1629.7 grams) was explained by lab's removal of duct tape wrapping); *Milliorn v. State*, 755 So. 2d 1217, 1225 (Miss. Ct. App. 1999) (holding five percent difference in weight of drugs measured by officer and that calculated at crime lab did not indicate tampering); *People v. Lanza*, 749 N.Y.S.2d 618, 621 (N.Y. App. Div. 2002) (holding discrepancy between officer's record of nine grams of cocaine including the evidence bag and the lab's record of .40 grams went to the weight of the evidence and not its admissibility); *State v.*

*Torres*, 69 P.3d 314, 317 (Utah Ct. App. 2003) (accepting criminalist's testimony that difference in weight of substances between field tests and lab tests was "very typical"); *Rosenbaum v. State*, 915 P.2d 1200, 1202 (Wyo. 1996) (accepting testimony that discrepancy between seized quantities of methamphetamine (47 grams and 3.4 grams respectively) and state crime lab's report (38.7 grams and 1.5 grams respectively) most likely occurred because field tests weighed the substances in the container on scales where the accuracy was unknown, whereas the lab weighed only the drug on certified scales).

While the weight difference provided fodder for Knight to criticize the State's handling of the cocaine evidence, it did not raise an inference of a break in the chain of custody. We find no abuse of discretion in the district court's decision that the State established sufficient foundation for the admission of the cocaine evidence. *See Biddle*, 652 N.W.2d at 196-97. The record indicates the chain of custody was not broken; the State accounted for the whereabouts of the cocaine from the day of its seizure until trial. *See State v. Orozco*, 290 N.W.2d 6, 10 (Iowa 1980) (entertaining presumption that state agents would not tamper with evidence). Deputy Van Waes, Lieutenant Kruse, and Criminalist Kelly all identified Exhibit 15 as the evidence they had handled. Knight's attorney had a chance to cross-examine these witnesses about the differences in the descriptions and the weights. He also highlighted those issues in his closing argument. Any discrepancies raised on appeal go to the relative strength of this exhibit as proof of Knight's guilt and not its admissibility. *See id.*

### 2. Exhibit 17

The State offered Exhibit 17, a baggie containing marijuana, during the direct examination of Lieutenant Guthrie. The district court admitted the evidence over Knight's objection. On appeal, Knight attacks this exhibit with arguments similar to those leveled against Exhibit 15. He notes Deputy Van Waes described the material in the baggie as a "green leafy substance" and recorded its weight as 28 grams. In turn, Lieutenant Guthrie described the baggie's contents as "plant material" testing positive for marijuana and logged its weight as 26.5 grams.

Both descriptions accurately depict Exhibit 17. Van Waes, Guthrie, Kruse and Buske offered a clear account of this exhibit's route from seizure to testing to trial. As described above, the State's witnesses explained packaging and scale sensitivity can account for the difference between field weights and lab weights. Like the district court, we are satisfied a chain of custody exists for the marijuana despite the differences in descriptions and weights.

### 3. Exhibit 18

During Guthrie's testimony, the State also offered Exhibit 18, a small jar containing a rock of hashish. Guthrie identified the jar as containing a resin-like substance that she tested. Knight objected to its admission based on differing descriptions of its color and the fact that Guthrie's test results did not confirm the substance was a form of marijuana. The district court allowed the exhibit into

evidence. DCI Criminal Kelly recognized Exhibit 18 as an item she had tested in the lab and confirmed that her tests indicated the compressed rock was hashish.[3]

On appeal, Knight renews his complaint that the State did not explain the discrepancies in the descriptions of the hashish. Knight submitted the following chart to point out the problems with Exhibit 18.

|  | Document | Description | Weight |
|---|---|---|---|
| Van Waes | Property Inventory | Green plastic container w/ green substance | N/A |
| Guthrie | FDPD Marijuana Testing Lab | Gold resin | .8 grams |
| Kelly | Drug Chemistry report | Brown rock-like substance | .66 grams |
| Kruse | Trial Testimony | Black rock-like substance | N/A |

The State responds: "Exhibit 18 shows the hashish is held in a plastic screw-top container that is stained with a greenish-gold residue, so it is not unreasonable that the witness descriptions vary slightly." Inside that container is a small rock-like substance, which is dark in color. After viewing Exhibit 18, we believe the descriptions of the substance are not so dissimilar that they undermine the otherwise well-linked chain of custody.

As to the weights, Guthrie explained her testing destroyed approximately one tenth of one gram. She also testified she was not concerned by the .14 gram difference between the weight she recorded and the weight listed in the DCI report: "There are other factors here. I don't know what type of scale they

---

[3] Kelly explained hashish is "very similar to what we do to sugar cane. So sugar cane is in a plant, they pull all the good stuff out and they concentrate it and that's sugar. Well hashish is like that . . . on a marijuana plant, there are more places where the hallucinogen or chemical of interest for getting high is located."

used; and granted they did other tests on it other than the four tests for marijuana to come up their conclusion it was hashish." Guthrie explained her Fort Dodge lab was not equipped to detect hashish. The district court could reasonably have accepted these explanations for the differing measures and test results.

We reach the same conclusion regarding the admissibility of the hashish as we did with the cocaine and the leafy marijuana. The district court did not abuse its discretion in finding the State's witnesses established an adequate chain of custody for Exhibit 18. The range of colors used to identify the hashish supplied Knight with ammunition to question the quality of the State's evidence. But the depictions were not so disparate as to disqualify the exhibit from admission. The jury had the opportunity to consider and weigh the discrepancies in determining if the State proved Knight's guilt beyond a reasonable doubt.

Having found no violation in the stop of Knight's vehicle or the admission of drug evidence, we affirm.

**AFFIRMED.**