# IN THE COURT OF APPEALS OF IOWA

No. 21-0315
Filed August 3, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ANTHONY EUGENE ENGLISH,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Story County, James C. Ellefson,

Judge.


        Anthony English appeals his convictions and sentences for first-degree

murder and first-degree robbery.  **AFFIRMED.**


        Kent A. Simmons, Bettendorf, for appellant.

        Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.


        Heard by May, P.J., and Greer and Chicchelly, JJ.

**MAY, Presiding Judge.**

Someone robbed and murdered Xavier Shepley. The State charged Anthony English. A jury found English guilty of first-degree murder and first-degree robbery. English appeals his convictions and sentences. We affirm.

**I. Background Facts & Proceedings**

Xavier Shepley lived in an apartment in Ames with two roommates. One night, Shepley told his roommates that he planned to have a woman over. Shepley had been chatting with the woman on Snapchat for about a week. In the early morning hours of November 18, 2017, the woman arrived at Shepley's apartment. Shepley's brother and one of his roommates were awake when the woman arrived.

The group sat around chatting and drinking for a bit. At some point, the woman said that her friend needed to charge her cell phone. The group agreed to let her friend, Albrea Winfrey, come in. The group hung out, and it "was just a good vibe." While hanging out, Winfrey used her cell phone "almost the whole entire time." Then, Winfrey said she needed to make a phone call and left the apartment through the front door. She left the door unlocked behind her.

About fifteen or twenty minutes later, two men wearing masks barged into the apartment. One of the men held a gun and aimed it at Shepley. The man with the gun told Shepley to "give us everything you have." Meanwhile, the first woman (the one Shepley had invited over) said to "do whatever they say and they won't hurt us". Then she left the apartment.

The man with the gun told Shepley and his companions to go to the back room of the apartment. They ended up seated in the back hallway of the apartment. The gunman repeated his demand for "everything you have." Shepley

responded that he didn't have anything. The gunman struck Shepley's head with the handgun. Reacting, Shepley reached out, apparently to grab the handgun. For a brief moment, Shepley and the gunman wrestled for the handgun. A shot rang out, and the two intruders fled the apartment. Shepley had been shot in the shoulder, and he later died from his injuries. After Shepley was shot, his brother ran after the intruders and saw a black Chevy Avalanche speeding off.

The next morning, English called Darren Coleman, an acquaintance of his living in Atlanta, Georgia.[1] English told Coleman that he wanted to "come down to Atlanta." When English arrived in Atlanta, he was with a woman, Jordan Bryant. English and Bryant were driving a black Chevy Avalanche with Iowa license plates. During English and Bryant's stay in Atlanta, English told Coleman about the circumstances leading to their visit. At trial, Coleman explained it this way:

> [English] had been looking at a KCCI report, the news report, and [English's] girlfriend kind of started panicking and stuff; and when she had seen the news report wasn't about them, [Coleman] asked them what had happened and he said that detective dropped off a card at his mom's house saying "call back." And from there, he ended up telling [Coleman] that he ended up robbing a dude in Ames and accidentally killed him.

English and Bryant were in Atlanta for about three weeks. Just a few weeks later, English and Bryant were taken into custody in Panama City, Florida.

English was charged with first-degree murder and first-degree robbery. A jury found him guilty on both charges. English appeals.

---

[1] Sometime after this, Coleman was convicted of unrelated federal crimes. He testified against English pursuant to a proffer agreement with the federal government.

**II. Standards of Review**

The standard of review for all issues in this case is for abuse of discretion. *See State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (motion for mistrial); *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003) (evidentiary rulings); *State v. Thacker*, 862 N.W.2d 402, 405 (Iowa 2015) (sentencing).

**III. Discussion**

English raises three claims. First, he argues the district court abused its discretion in denying his mistrial motions. Second, English contends the district court improperly admitted certain evidence. And third, English claims the district court abused its sentencing discretion. We address each claim in turn.

**A. English's Mistrial Motions**

English moved for a mistrial during opening statements and then again during the State's case. The district court denied both motions. We consider each motion separately.

*i. Opening Statements[2]*

Before trial, English moved in limine to prohibit the State from introducing evidence of English's "prior convictions, prior bad acts, prior uncharged crimes, or suspicion of prior crimes or bad acts." In a hearing on the motion, English explained that he sought to exclude evidence that he and Bryant were arrested in Florida on unrelated prostitution charges. The State then explained that it sought to introduce evidence of the Florida arrest to explain how English was returned to

---

[2] We question whether English intended to raise this issue on appeal. English raises this claim in the preservation-of-error section of his brief and does not discuss it in the merits portion. Nonetheless we address it to ensure all of English's preserved and presented claims are addressed.

Iowa—and to establish foundation for evidence seized in connection with the arrest. But the State did not intend to offer evidence about the unrelated Florida charges. The district court concluded that evidence of English's contact with Florida law enforcement—and Florida's subsequent surrender of English to Iowa— would be "in bounds." But the court made clear that the State would not be allowed to "talk about the Florida charges."

During the State's opening statements, the prosecutor mentioned the Florida arrest, which led to an objection from English:

> PROSECUTOR: Mr. English and Ms. Bryant were eventually arrested in Panama City, Florida by the Panama City Police Department. We have two officers we hope who will get here, but a big hurricane's happening down there which is throwing a little wrench in our schedule; but we're making every effort to get them back up here. The hotel room in which they were arrested—
> DEFENSE COUNSEL: Your Honor, I have an objection. I'd like a motion to strike with "arrested."

English explained that the usage of the word "arrested" implies a prior bad act in violation of the pre-trial ruling, and English moved for a mistrial. The State argued that "the fact of arrest is not a prior bad act." The district court ultimately rejected English's motion.

We find no abuse of discretion in the court's ruling. "[T]o show an abuse of discretion by the district court in denying a motion for mistrial, the defendant must show prejudice that prevented the defendant from having a fair trial." *State v. Tewes*, No. 20-0253, 2021 WL 1904693, at *5 (Iowa Ct. App. May 12, 2021) (citing *State v. Callender*, 444 N.W.2d 768, 770 (Iowa Ct. App. 1989)). But we do not

think the prosecutor's remarks even violated the court's pre-trial ruling.[3]  The pretrial ruling prevented the State from introducing evidence of "the Florida charges."  But the State only discussed the fact that English and Bryant were taken into custody in Florida—not that they were facing any particular charge, much less Florida charges.  Accordingly, we find the district court did not abuse its discretion in denying English's first mistrial motion.  We turn to the second motion.

### ii. Holloway Testimony

Desirae Holloway is the cousin of one of English's co-defendants.  Holloway and English had a "friends with benefits" relationship.  She also purchased the handgun connected to Shepley's murder.  At trial, Holloway testified about her relationship with English and her connection to this crime.  Two portions of her testimony are relevant to this appeal.  First, the State questioned Holloway regarding her knowledge of English's whereabouts at different points before trial:

> Q. When you spoke to the police about your gun in this case in April of '18, where was Mr. English at that time?  A. I have no clue.
> Q. Remember telling them that he was MIA, he was missing in action?  A. Yeah, because I hadn't talked to him.  I didn't know where he was.
> Q. All right.  You told them that he had been acting weird in December of 2018?
> DEFENSE COUNSEL: Objection, leading.
> THE COURT: Under the circumstances here, I'm going to allow leading questioning.  Go ahead and answer.
> A. I assumed he was acting weird because *I knew that he had a violation from running from the Fort*.

---

[3] English's brief clarifies that on appeal "[t]he question here is not whether the judge erred in ruling on the admissibility of the evidence.  The question is whether the [d]efendant was deprived of the chance to get a fair trial once the pretrial ruling was violated."

(Emphasis added.) At this point, English objected and again moved for a mistrial because "running from the Fort" referred to English's prior escape from the Fort Des Moines Correctional Facility, which led to additional Iowa charges for English. Holloway had previously testified about "the Fort" when discussing why she decided to purchase a firearm:

> Q. Okay. And did you have a particular reason for wanting to purchase a weapon? A. Well, yeah. I stayed by the Fort, which has a lot of criminals, and I lived in an apartment building where a neighbor had got stabbed to death by her sister like two weeks before that.

Taken together, English argued, these bits of testimony improperly introduced prior bad act evidence and required a mistrial. The district court denied the motion but offered English a choice to issue a curative instruction to the jury to disregard testimony about "the Fort." English declined the district court's offer so as not to "draw more attention to the issue."

On appeal, English argues the district court abused its discretion by not granting a mistrial following Holloway's testimony. Our ultimate question is whether "the trial court was clearly unreasonable in concluding an impartial verdict could be reached." *State v. Johnson*, No. 19-0579, 2020 WL 5650731, at *2 (Iowa Ct. App. Sept. 23, 2020) (quoting *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006)). For three reasons, we answer that question in the negative.

First, the isolated and abrupt nature of Holloway's testimony mitigates the risk of prejudice. *See State v. Lopez-Aguilar*, No. 17-0914, 2018 WL 3913672, at *4 (Iowa Ct. App. Aug. 15, 2018). Besides the two instances cited, Holloway did not testify further about "the Fort" and offered no other substantive details about "the Fort." She did not indicate English had received additional charges either,

only that he had a "violation." And English concedes these comments were "inadvertent and brief." Considered against the backdrop of a six-day trial, we think the district court properly concluded that English was not denied a fair trial with impartial jurors. *See Newell*, 710 N.W.2d at 33.

Second, we believe the district court took proper steps to mitigate any risk of prejudice from Holloway's offhand comments. Although English declined an immediate curative instruction following the remarks, the jury was instructed at the conclusion of trial to refrain from considering other acts, charges, or crimes. Cautionary instructions like these are typically sufficient to ameliorate prejudice in all but the most extreme situations, and we presume the jury followed the instructions. *State v. Plain*, 898 N.W.2d 801, 815 (Iowa 2017); *State v. McMullin*, 421 N.W.2d 517, 520 (Iowa 1988).

Finally, other evidence of English's guilt limits any prejudicial effect of this comment. *Plain*, 898 N.W.2d at 815 ("Because the State's evidence on the contested point was strong, the prejudicial effect of the challenged testimony is minimal."). For instance, Winfrey's testimony supported the State's theory of the case—and cell phone records corroborated Winfrey. Physical evidence, like the blood in Shepley's apartment, also matched testimonial accounts from that night. English and Bryant's flight from Iowa permitted the jury to infer consciousness of guilt. *See State v. Bass*, 349 N.W.2d 498, 502 (Iowa 1984) ("[A]n individual's flight from the scene of the crime is a circumstance from which a jury may find the defendant departed because of his consciousness of guilt."). Plus, Coleman testified that English admitted to robbing and killing Shepley. This and other

substantial evidence of guilt reduces the risk that the jury improperly convicted English based on Holloway's off-hand comment.

Between the inadvertent and brief nature of Holloway's remarks, the cautionary instruction issued by the district court, and the substantial other evidence of English's guilt, we cannot say the district court was "clearly unreasonable in concluding an impartial verdict could be reached." *Johnson*, 2020 WL 5650731, at *2 (quoting *Newell*, 710 N.W.2d at 32). So we affirm the district court's mistrial rulings.

**B. Exhibit 66—The Jailhouse Note**

Next, we turn to English's evidentiary challenge to a jailhouse note admitted during Winfrey's testimony.

Winfrey was charged as a co-defendant in this case, but she took a plea deal. Part of her plea agreement required Winfrey to testify truthfully against English. During Winfrey's testimony, the State introduced a note that Winfrey claimed she obtained while in jail. This note—exhibit 66—encouraged Winfrey not to testify against anyone and to hold out for a good plea deal. Winfrey's testimony implied that the note was authored by English and then passed through other inmates to Winfrey. The note was admitted over English's foundation objection.[4] Here is its full text:

> A. They cant do shit to you they only using these charges as leverage to get you to tell some shit. The only way they can convict you of murder at trial is if they can first find you guilty of robbery. But in order to find you guilty of robbery you would've for one had to been

---

[4] As the State questioned Winfrey to establish foundation for the exhibit, the prosecutor asked Winfrey who another person said the note was from. English raised a hearsay objection, which was sustained. However, English never raised a hearsay objection as to the contents of the note.

in the house which according to the paperwork you weren't in there during the time all this took place and second you would've have to of threatened some one which nobody says you did. Don't let these people scare you no matter what they have to give you a good ass plea. You don't have to tell on nobody to get it. You know they don't have shit anyway they think me and bro was there [a]nd we don't look shit like the lil bro's. But just let them think it was us and we all goin home. Just stay solid and don fold there ain't shit they can do. [A]Nd they can't say aiding and abetting shit is bullshit to they first of all only have that your phone contacted another phone that was close by but they can't prove who it is or what it's about obviously or they wouldn't of called this a robbery plot and they wouldn't think that me [a]nd bro was there. It says in the lawbook 703 aiding and abetting that one persons guilt doesn't determine another persons guilt. Meaning they have to punish you for your involvement which you don't have. So be confident at going to tr[ia]l or taking a plea that you want because they dont want to take you to trial. Don't work wit these ppl and dont talk to nobody bout your case. Love tho sis hold your head flush this when finished.

English claims the note should not have been admitted because of its dubious origins.[5] We disagree. The foundational bar is low. *State v. Goodwin*, No. 18-1822, 2020 WL 1551149, at *4 (Iowa Ct. App. Apr. 1, 2020) ("[A] 'district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which a jury could *reasonably* find that the evidence is authentic.'" (emphasis added) (quoting *United States v. Hassan*, 742 N.W.2d 104, 133 (4th Cir. 2014))). The authentication component of foundation "is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Vayner*, 769 F.3d 125, 129–30 (2nd Cir. 2014) (citation omitted). Put another way, laying foundation does not require an explanation of all the circumstances surrounding a piece of

---

[5] The State's brief contests error preservation. However, at oral argument, the State agreed it would be "cleaner" to address the merits of English's argument. But to the extent English argues the note in inadmissible because it contains hearsay, his argument is not preserved for our review.

evidence. *Cf. State v. Knight*, 853 N.W.2d 273, 279 (Iowa Ct. App. 2014) (noting the State is not required to provide absolute certainty that evidence is not tampered with or substituted). Instead, a proponent must merely provide sufficient information that *could* allow a jury to determine the evidence is what the proponent claims. *See* Iowa R. Evid. 5.901(a).

Here, Winfrey testified she received the note from someone named Alicia who shared her "pod" while in jail. She noted that Alicia's boyfriend and English were also in the same jail. And at one point, Alicia, Alicia's boyfriend, and English were all in the visitation room together, presumably when the note could have been passed from English to Alicia through the boyfriend. So, Winfrey explained, she thought she knew who wrote the note, insinuating it was from English. Plus, as the State emphasizes, the contents of the note strongly suggest that its author was charged in the robbery-turned-killing, as English was. All of this, taken together, was enough to establish foundation.

We understand English would have preferred the State call both Alicia and her boyfriend to testify about their roles in passing the note from person to person. But the State's process is not inherently deficient simply because it occurred in a contracted manner. And, of course, English was free to argue—and did so in closing—that the jury should not believe Winfrey's testimony about the note's origins.[6] *See Knight*, 853 N.W.2d at 279 ("When the district court finds the State

---

[6] Moreover, any error in admitting the note was harmless. The note was a small portion of the evidence facing English. And as the State points out, because the evidentiary weight of the note is entirely dependent on the jury's assessment of Winfrey's credibility, any prejudice is substantially mitigated: If the jury believed Winfrey's account of the note, they likely already believed her account of English's

has established a sufficient foundation for admitting the physical evidence, 'any speculation to the contrary affects the weight and not the admissibility of the evidence.'" (citation omitted)).

We conclude the district court did not abuse its discretion in admitting the note.

### C. Sentencing

Finally, English argues the district court abused its discretion by ordering his sentences for first-degree murder and first-degree robbery to run consecutively to any existing sentence.

English contends the district court misapplied a statutory presumption for consecutive sentences for probation violators because English was not on probation when he committed the crimes in this case. But as the State points out, despite the district court's misunderstanding of English's probation status, the correct sentence was imposed because the court was still *required* to order the murder and robbery sentences run consecutive to English's existing sentence. Iowa Code section 901.8 (2021) provides in part: "If a person is sentenced for escape under section 719.4 or for a crime committed *while confined in a detention facility or penal institution*, the sentencing judge shall order the sentence to begin at the expiration of any existing sentence." (Emphasis added.) Section 901.8 applies here: Three months before this crime, English was released to Fort Des Moines Correctional Facility for work release. Just over a month later, he escaped. So the murder and robbery occurred when English was on escape from work

---

involvement in the crime and his decisions afterwards. So by that point, the note would have little impact on the outcome of the case.

release. And our cases have repeatedly held work release is a form of confinement. *State v. Jackson*, No. 19-0204, 2020 WL 4814073, at *1 (Iowa Ct. App. Aug. 19, 2020) (collecting cases).[7] English's escape does not affect that status. *See Knipe*, 349 N.W.2d at 772. So English was legally committed to confinement at the time he perpetrated the crimes in the instant case. Consequently, the district court had *no* discretion in running English's sentences consecutively or concurrently to his existing sentence: Iowa Code section 901.8 required the sentences run after "the expiration of any existing sentence."

---

[7] We have considered English's argument that, because he had been granted work release, he was not an "inmate" but rather a mere "resident" of Fort Des Moines Correctional Facility. And because he was "release[d]" on work release, English contends, he was in the same position as a parolee; so, under *State v. Finchum* he was no longer committed for purposes of section 901.8. *See* 364 N.W.2d 222, 225 (Iowa 1985) (agreeing that, because a "parolee is released from commitment, he is no longer committed and therefore does not fall within the purview of 901.8").

As noted above, however, this court has regularly concluded that work release counts as commitment. *Jackson*, 2020 WL 4814073, at *1 (collecting cases). And while those cases have not been published, we still hesitate to "disregard" them, in part because we must uphold the "basic principle of the rule of law" that "courts 'treat like cases alike.'" *State v. Shackford*, 952 N.W.2d 141, 149–50 (Iowa 2020) (McDonald, J., dissenting) (quoting *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2134 (2020) (Roberts, C.J., concurring)). Moreover— and contrary to English's theory—the Iowa Code says that "inmates" granted work release are still "*inmates* sentenced to an institution under the jurisdiction of the department" of corrections *even though* they enjoy a limited "privilege of leaving actual confinement during necessary and reasonable hours" for employment-related activity. Iowa Code § 904.901(emphasis added). So English's position was similar to that of the defendant in *State v. Knipe*, who committed a crime while enjoying a furlough—"the privilege of authorized permission to leave the institution." *See* 349 N.W.2d 770, 772 (Iowa 1984). And we note the *Knipe* court found that crime-on-furlough is nonetheless "crime committed while confined in a detention facility or penal institution" for purposes of section 901.8. *Id.* We think the same applies here.

So, although the district court was mistaken in how it reached this portion of English's sentence, after applying the correct law, the end result is ultimately the same. Therefore, as to this issue, we see no grounds for reversal.

Finally, to the extent English also argues the district court failed to provide adequate reasoning for running the murder and robbery sentences consecutively to each other, we disagree. Iowa Rule of Criminal Procedure 2.23(3)(d) requires the district court to "state on the record its reason for selecting the particular sentence." Rule 2.23(3)(d) applies to the district court's decision to impose consecutive sentences. *State v. Jacobs*, 607 N.W.2d 679, 690 (Iowa 2000). So the district court was required to provide some justification; but that justification may be "terse and succinct." *See State v. Thacker*, 862 N.W.2d 402, 408 (Iowa 2015) (citation omitted). Here, the court explained it selected consecutive sentences "due to [English's] character and propensities as demonstrated by his lengthy criminal record as an adult." And the court further explained: "The sentences are run consecutive to each other for the additional reason that the rehabilitation of [English] appears unlikely and that the extended sentence is necessary for the protection of the community." This was sufficient to explain the imposition of consecutive sentences.

## IV. Conclusion

Because English has shown no abuse of discretion, we must affirm.

**AFFIRMED.**